THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
HORACE NELSON LAWS, DEFENDANT-APPELLANT.

THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JOHN WASHINGTON, DEFENDANT-APPELLANT.

Reargued January 9, 1968—Decided May 6, 1968.

Mr. *Charles L. Bertini* argued the cause for appellant Horace Nelson Laws.

Mr. *Gerald E. Monaghan* argued the cause for appellant John Washington.

Mr. *Guy W. Calissi,* Bergen County Prosecutor, argued the cause for respondent State of New Jersey (*Mr. Richard F. Aronsohn,* Special Assistant Prosecutor, on the brief).

Mr. *William J. Brennan, III,* Deputy Attorney General, argued the cause on behalf of *Mr. Arthur J. Sills,* Attorney General of New Jersey, *amicus curiae* (*Mr. Alan B. Handler,* First Assistant Attorney General and *Mr. Joseph A. Hoffman,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by
JACOBS, J. The defendants were convicted of murder in the first degree and were sentenced to death. They appealed to this Court and after full consideration we found that their guilt was firmly established in a fair trial free from prejudicial error, apart from a single error which bore not on guilt but on the death sentences alone. 50 *N. J.* 159, 187

(1967). At oral argument, the State, which undoubtedly could have waived the death penalty before or at trial (*In re Waiver of Death Penalty,* 45 *N. J.* 501 (1965)), took the position that, rather than a reversal and full retrial because of the sentencing error, the murder convictions should be modified so that the defendants would stand convicted of murder in the first degree with life imprisonment. However, the defendants asserted that this Court lacked the power to modify and that consequently there must be a complete retrial. 50 *N. J.,* at *p.* 188. We ordered reargument on this issue and invited the Attorney General to file a brief and argue *amicus curiae.* 50 *N. J.,* at *p.* 189.

In their supplemental brief and at the reargument the defendants reasserted that this Court lacked modification power and that they were entitled to a retrial on both guilt and punishment. The State, through the County Prosecutor, filed a supplemental brief recommending that the findings of guilt be permitted to stand and the matter be remanded for a trial limited to "the sole issue of penalty imposition, before the jury that sat at the original trial or a newly impanelled jury." If such course is held unavailable, the State's position, as expressed by the prosecutor at the reargument, is that the judgments of conviction should not be reversed for full retrial but should be modified so that the defendants would stand convicted of murder in the first degree with life imprisonment; indeed the prosecutor indicated that since Dennis Kingsley (50 *N. J.,* at *p.* 167) and perhaps other important witnesses for the State had disappeared he might not, in the event of reversal, be able to bring the matter on for such retrial at all.[1] The Attorney

---

[1] In response to questions addressed to him during oral argument, the prosecutor stated that there was "an insurmountable obstacle in this particular case" to a retrial and that he did not think there would be another trial "in view of certain problems"; and in answer to a direct inquiry as to whether he requested the Court to affirm with a life sentence, assuming it had power to do so, he said, "My position is that in view of the circumstances of this case I would say that I would prefer that the Court reduce it to life because" of the retrial problems.

General filed a brief *amicus curiae* which asserted unequivocally that "this Court has the power to review the sentences of death herein and to impose sentences of life imprisonment"; at the reargument this position was reaffirmed with the recommendation that there be a modification rather than a reversal in the case at hand.

Passing for the moment any special considerations applicable to capital cases, it would appear entirely clear that our appellate courts have power to review and modify sentences in appropriate circumstances. There was a time in history, as evidenced by *State v. Gray,* 37 *N. J. L.* 368 (*Sup. Ct.* 1875), when judges thought otherwise with consequences now recognized as patently offensive to reason and good sense. In *Gray* a defendant was lawfully convicted of adultery but was improperly sentenced to the state prison rather than to the county jail; on appeal, the sentence was held to be improper but the court, instead of modifying it, set the defendant free. To insure against miscarriages of this sort, the Legislature provided that, whenever a conviction is reversed for error in the sentence, the appellate court may enter the judgment which should have been rendered or may remand the matter to the lower court for that purpose. See *L.* 1898, *c.* 237, § 144, *p.* 916; *R. S.* 2:195–23; *R. S.* 2:195A–13; *State v. Burns,* 136 *N. J. L.* 601, 603 (*E. & A.* 1948); *State v. Garton,* 102 *N. J. L.* 318, 321 (*E. & A.* 1926); *State v. Huggins,* 84 *N. J. L.* 254, 261 (*E. & A.* 1913). In *State v. Culver,* 23 *N. J.* 495, *certiorari* denied, 354 *U. S.* 925, 77 *S. Ct.* 1387, 1 *L. Ed. 2d* 1441 (1957), this Court flatly rejected the technisms of *Gray* and gave clear expression to the broad appellate power to modify sentences, a power which was found to be an inherent judicial one (23 *N. J.,* at *pp.* 501, 511) as well as one supported formerly in the practice acts and now in the practice rules. 23 *N. J.,* at *pp.* 500-504; *R. R.* 1:5–1 (*c*); *R. R.* 1:9–1; *R. R.* 1:5–4.

In *Culver* the defendant was lawfully convicted of armed robbery but was erroneously sentenced to life imprisonment.

He contended that *Gray* embodied the common law and that under it he should be set free, stressing that the legislation (*R. S.* 2:195A–13) which had been enacted to obviate *Gray* had been repealed on the adoption of Title 2A of the Revised Statutes. But as Chief Justice Vanderbilt properly pointed out, the repealer was simply legislative recognition that the identical subject had been effectively dealt with in the court rules adopted under the Supreme Court's constitutional authority to govern practice and procedure. *N. J. Const., Art* VI, § 2, *par.* 3. 23 *N. J.,* at *p.* 502. And as to the contention that Gray voiced common law principles, the Chief Justice aptly noted that the common law is a living force with ample capacity for development and adaptation to current needs and beliefs. 23 *N. J.,* at *p.* 505; see *Collopy v. Newark Eye and Ear Infirmary,* 27 *N. J.* 29, 43–48 (1958). In the light of such needs and beliefs, he found little difficulty in rejecting *Gray* along with its archaic English foundations and in announcing that, as a matter of present common law, our appellate courts have the inherent power "to correct an illegal or improper sentence." 23 *N. J.,* at *p.* 505.

In *State v. Johnson,* 67 *N. J. Super.* 414 (*App. Div.* 1961) the defendants were convicted of rape and kidnapping and received sentences to be served consecutively. On appeal, they contended that their sentences were manifestly excessive and should be modified. In a comprehensive opinion by Judge Gaulkin, the Appellate Division upheld the appellate power "to revise a sentence where it is manifestly excessive, even though within authorized statutory limits." 67 *N. J. Super.,* at *p.* 432. It cited the pertinent language in Culver, the out-of-state decisions which have held that "the right to affirm, reverse, or modify judgments includes the right to revise sentences" (67 *N. J. Super.,* at *p.* 431) and the persuasive legal literature which sets forth the many compelling arguments in favor of appellate review of sentences. See Hall, *Reduction of Criminal Sentences on Appeal,* 37 Colum. L. Rev. 521 (1937); Mueller, *Penology on Appeal: Appellate Review of Legal But Excessive Sentences,*

15 *Vand. L. Rev.* 671 (1962) ; *ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences, pp.* 13–20 (Tent. Draft, April 1967) ; *cf.* 20 *Stan. L. Rev.* 405 (1968) ; 14 *How. L. J.* 29 (1968) ; 18 *Maine L. Rev.* 133 (1966) ; 74 *Yale L. J.* 379 (1964) ; 16 *Rutgers L. Rev.* 186 (1961) ; 46 *Iowa L. Rev.* 159 (1960) ; 36 *U. Det. L. J.* 356 (1959). See also *State v. Mull,* 30 *N. J.* 231, 239 (1959).

The authority of *Johnson* has been repeatedly acknowledged in later Appellate Division cases, though in most of them (but not all) the lower court was found not to have exceeded its discretionary sentencing power. See *State v. Wasserman,* 75 *N. J. Super.* 480, 485 (*App. Div.* 1962), affirmed 39 *N. J.* 516 (1963) ; *State v. Gibbs,* 79 *N. J. Super.* 315, 324–326 (*App. Div.* 1963) ; *State v. Furino,* 85 *N. J. Super.* 345, 349 (*App. Div.* 1964) ; *State v. Hall,* 87 *N. J. Super.* 480, 484–485 (*App. Div.* 1965) ; *State v. Ford,* 92 *N. J. Super.* 356, 361 (*App. Div.* 1966) ; *State v. Driesse,* 95 *N. J. Super.* 491, 494 (*App. Div.* 1967). And although the power to modify illegal and improper sentences was explicitly recognized in *Culver,* this Court has thus far not had any occasion to modify a sentence as manifestly excessive, as was done in *Johnson.* However, in *State v. Tyson,* 43 *N. J.* 411, 417 (1964), *certiorari* denied, 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed. 2d* 279 (1965) we recently gave unmistakable indication that upon a showing of "abuse of discretion" by the trial court we would not hesitate to reduce a sentence though it was within the outer bounds fixed by statute; indeed we could hardly take any lesser course without being faithless to our reviewing responsibilities and the true interests of right and justice.[2]

---

[2] In *Johnson, supra,* the Appellate Division noted that, sentencing matters apart, it could not recall any exercise of discretion "which today is not reviewable." 67 *N. J. Super.,* at *p.* 425. And Mueller, in his article on review of sentences, *supra,* made the following comment:

It has been argued that the review is inconsistent with the trial judge's discretion. But there is no such thing as an un-

In considering the scope of this Court's reviewing authority, we must bear clearly in mind the fact that its current source of power is the 1947 Constitution. See *Hager v. Weber,* 7 *N. J.* 201, 205 (1951). That organic document purposefully modernized and greatly strengthened our judicial system. In the process it vested this Court with wide judicial power, perhaps more sweeping than that granted to any other court of last resort, and all to the end that it would be in a fair position to insure that justice is truly and equally done. It replaced the earlier and narrower "writ of error" with a comprehensive "appeal," (*Art. VI, §* 5, *par.* 1), and directed that this Court "exercise appellate jurisdiction in the last resort in all causes" provided in the Constitution. *Art. VI, § 2, par.* 2. It granted original jurisdiction to the extent necessary to enable "complete determination of any cause on review." *Art. VI, § 5, par.* 3. It delegated broad power to make rules governing "the practice and procedure" of all courts within the State. *Art. VI, § 2, par.* 3. And it provided that, in lieu of the prerogative writs under which inferior tribunals had been supervised (*Mellor v. Kaighn,* 89 *N. J. L.* 543, 545 (*E. & A.* 1916)), review shall be had "in the manner provided by rules of the Supreme Court, as of right, except in criminal causes where such review shall be discretionary." *Art. VI, § 5, par.* 4. See *Jaffe, Judicial Control of Administrative Action* 170, 378, 467 (1965).

Following the adoption of the Constitution, comprehensive court rules were promulgated which faithfully sought to carry out the high purposes of the constitutional draftsmen. One of these rules stated that the Supreme Court could set aside a jury verdict as against the weight of the evidence. See *Rule* 1:2–20—now *R. R.* 1:5–3. *Flanigan v. Guggenheim Smelting Co.,* 63 *N. J. L.* 647 (*E. & A.* 1899) had held that the old court of last resort had no such power and in *Hager v.*

supervised discretion; it would be anarchy. This argument could only be made, it would seem, by those who are unaware of the dimensions of "discretion." 15 Vand. L. Rev., at *p.* 684.

*Weber, supra,* 7 *N. J.* 201, an attack was made on the new rule. This was quickly rejected in an opinion by Justice Heher which explicitly noted that appellate review is concerned with the remedy and is "a remedial procedure secured against legislative interference" by the various provisions of the 1947 Constitution. 7 *N. J.,* at *pp.* 205–06. Stressing the broadened and strengthened nature of the Supreme Court's reviewing power, he said:

Now, by the Constitution of 1947, the common-law writ of error has been superseded by the appeal therein provided. *Article VI, Section V, paragraphs* 1, 2. Under paragraph 3 of the same section, the Supreme Court and the Appellate Division of the Superior Court may exercise "such original jurisdiction as may be necessary to the complete determination of any cause on review." This grant of original jurisdiction is significant of a design to provide a review of matters of fact as well as of law, in accordance with the historic function of an "appeal." For the history and the varied uses of the "appeal" in American and English jurisprudence, see *Vaill v. McPhail,* 34 *R. I.* 361, 83 *A.* 1075 (1912). There is no ground whatever for supposing that the framers of the Constitution had in mind an "appeal" in law cases that would merely perform the office of the old writ of error in mode and scope of review. 7 *N. J.,* at *p.* 211.

Recognizing, as we do, an appellate power to review and modify sentences in the ordinary run of cases, we come now to the capital cases. Unlike more limited constitutional provisions in other states (see, *e. g.,* the California Constitution which provides in Article 6, Section 4, that its Supreme Court shall have appellate jurisdiction "on questions of law alone, in all criminal cases where judgment of death has been rendered"), our Constitution provides unrestrictedly that an appeal may be taken as of right to the Supreme Court "in capital causes." *Art.* VI, § 5, *par.* 1. There has of course been considerable legislation dealing with capital causes and its history has been carefully set forth on many occasions. See *State v. Martin,* 92 *N. J. L.* 436 (*E. & A.* 1919); *State v. Molnar,* 133 *N. J. L.* 327 (*E. & A.* 1945); *State v. Johnson,* 34 *N. J.* 212, appeal dismissed, 368 *U. S.* 145, 82 *S. Ct.* 247, 7 *L. Ed.* 2d 188, *certiorari* denied, 368

*U. S.* 933, 82 *S. Ct.* 370, 7 *L. Ed.* 2d 195 (1961); *State v. Sullivan,* 43 *N. J.* 209 (1964), *certiorari* denied, 382 *U. S.* 990, 86 *S. Ct.* 564, 15 *L. Ed.* 2d 477 (1966). Nowhere in this history is there any suggestion of either legislative authority or purpose to curb appellate powers; indeed all of it may be searched in vain for any indication whatever that, in fixing and altering the penalty for murder, the legislators ever gave any thought to or ever entertained any restrictive views with respect to the court's authority on appeal. See *L.* 1898, *c.* 235, § 108, *p.* 825; *L.* 1916, *c.* 270, § 1, *p.* 576; *L.* 1919, *c.* 134, § 1, *p.* 303; *R. S.* 2:138–4; *N. J. S.* 2A:113–4.

The 1898 statute directed, as did earlier legislation, that every person convicted of murder in the first degree shall be put to death (*L.* 1898, *c.* 235, § 108, *p.* 825); the 1916 statute directed that the punishment be death unless the jury recommends life imprisonment (*L.* 1916, *c.* 270, § 1, *p.* 576); and the 1919 statute directed, as does our current law, that the punishment be death unless the jury shall by its verdict, "and as a part thereof," upon and after consideration of all the evidence, recommend life imprisonment "in which case this and no greater punishment shall be imposed." *L.* 1919, *c.* 134, § 1, *p.* 303; *R. S.* 2:138–4; *N. J. S.* 2A:113–4. None of the cited statutes was addressed in any manner to appellate proceedings after conviction which, as our practice rules explicitly provide, culminate in a mandate that the judgment appealed from be "affirmed, reversed or modified." *R. R.* 1:9–1. Under the 1898 statute, there was no choice but to impose the death penalty; under the 1916 statute the jury had the choice between life imprisonment and the graver penalty of death;[3] and under

---

[3] The statement attached to the bill which became *L.* 1916, *c.* 270, and which originally set forth that the punishment shall be death unless the jury recommends life imprisonment, read simply as follows:

The purpose of this amendment is to make it possible for the jury, in rendering a verdict of murder in the first degree, to exercise clemency in any case where the death penalty seems too severe under the facts shown in that particular case.

the 1919 statute, as now, its choice of life imprisonment was to be part of its verdict after consideration by it of all the evidence in the case. See *State v. Molnar, supra,* 133 *N. J. L.* at *pp.* 333–334; *State v. Mount,* 30 *N. J.* 195, 215–220 (1959).

■ From the legislation thus outlined it is indisputable that there is no mandatory penalty of death for first degree murder. The penalty is either death or the lesser punishment of life imprisonment. In deciding what penalty to impose in a given case, the jury exercises a discretion which is comparable to that exercised by the trial judge when choosing between higher and lesser punishment in other cases. In *State v. Johnson, supra,* 34 *N. J.* 212, Justice Proctor recently put the matter in appropriate terms as follows:

A jury deciding whether to recommend life imprisonment under *N. J. S.* 2A:113–4 is guided by the same implied standard as a trial judge assessing punishment under any other criminal statute, *i. e.,* the determination of that sentence within statutory limits which best serves the interests of justice as between society and the defendant. See *State v. Mount,* 30 N. J. 195, 216 (1959). *Cf. In re Steenback,* 34 *N. J.* 89 (1961). Admittedly, that is a general standard, but the only one which is meaningful in this context. Additionally, we note that the jury's discretion under *N. J. S.* 2A:113–4 *N. J. S. A.* is not absolute. It is limited by the statutory mandate that a recommendation of life imprisonment must be based "upon and after consideration of all the evidence." *State v. White,* 27 *N. J.* 158, 167 (1958). A determination of what circumstances make the imposition of capital punishment unjust or unwise is left to the collective discretion and judgment of the jury, as, in other contexts, it is ordinarily left to the judge. That determination must be made upon the facts of a particular case. Indeed, legislative specification of criteria for recommendation of life imprisonment might prejudice a defendant through the exclusion by omission of a factor relevant in a given case. We hold that *N. J. S.* 2A:113–4 *N. J. S. A.* which gives to the jury the discretion to recommend life imprisonment where it returns a verdict of first degree murder is constitutional. 34 *N. J.,* at *p.* 230.

There is no precedential decision in our State which discusses or deals with this Court's power to modify a first degree murder conviction by reducing a sentence of death to life imprisonment. The issue was not raised in *State v. White,* 27 *N. J.* 158 (1958) nor was it involved in other

cases such as *State v. Sullivan, supra,* 43 *N. J.* 209 and *State
v. Mount, supra,* 30 *N. J.* 195. Language in the cited cases as
to the nature of the jury's discretion in making its choice
between the death penalty and life imprisonment must of
course be read in context, and as thus read is clearly com-
patible with the unanimous opinion of this Court in *State
v. Johnson, supra,* 34 *N. J.,* at *p.* 230. There are, however,
precedential out-of-state decisions and it is highly significant
that in many of them sentences of death were reduced to life
imprisonment under local procedures akin to our own
though lacking the support of our expansive constitutional
history and authority. See *State v. Ramirez,* 34 *Idaho* 623,
203 *P.* 279, 29 *A. L. R.* 297 (1921); *Davis v. State,* 155
*Ark.* 245, 244 *S. W.* 750 (1922); *Williams v. State,* 183 *Ark.*
870, 39 *S. W.* 2d 295 (1931); *Frady v. United States,* 121
*U. S. App. D. C.* 78, 348 *F.* 2d 84 *(D. C. Cir.), certiorari*
denied, 382 *U. S.* 909, 86 *S. Ct.* 247, 15 *L. Ed.* 2d 160
(1965); *Coleman v. United States,* 123 *U. S. App. D. C.* 103,
357 *F.* 2d 563 (1965); *Spillers v. State,* —— *Nev.* ——, 436
*P.* 2d 18 (1968); *cf. Hubka v. State,* 40 *Okl. Cr.* 161, 267 *P.*
864 (1928); *Fritz v. State,* 8 *Okl. Cr.* 342, 128 *P.* 170
(1912); *Commonwealth v. Garramone,* 307 *Pa.* 507, 161 *A.*
733, 89 *A. L. R.* 291 (1932). See also *Austin v. United
States,* 382 *F.* 2d 129 *(D. C. Cir.* 1967).

In *Frady v. United States, supra,* the defendants were con-
victed of murder in the first degree and were sentenced to
death. Under the controlling District of Columbia Code, as
under the New Jersey statute, the jury could have recom-
mended life imprisonment, in which event that would have
been the penalty. On appeal, the court found no error as
to guilt but found error which bore on the death sentences.
In response to the court's inquiry, the Government took the
position that under 28 *U. S. C.* § 2106, which affords ap-
pellate power to affirm, reverse or modify, the Court of Ap-
peals could "modify the judgment by providing for a life
sentence or by remanding the case to the District Court with
directions to do so." 348 *F.* 2d, at *p.* 91; *Coleman v. United*

*States, supra,* 357 *F. 2d,* at *p.* 572. The court so modified and imposed sentences of life imprisonment. In the course of the principal opinion, Judge Fahy noted that it was "impossible, and impermissible, to reconvene the same jury to consider now the punishment"; that a new jury was "not required to be convened for that purpose, assuming a jury other than the trial jury could validly perform the sentencing" under the Code; and that since the death sentences could not stand, "the appropriate solution" under all of the circumstances was to direct the entry of sentences of life imprisonment. 348 *F. 2d,* at *pp.* 90–91.

In *Austin v. United States, supra,* the defendant was convicted of first degree murder. The prosecutor had not requested the death penalty and on the jury's recommendation of life imprisonment the defendant was so sentenced. On appeal, the Court of Appeals found that, although the evidence did not establish murder in the first degree, it did establish murder in the second degree. It did not order a new trial but directed that the defendant be resentenced by the trial judge unless he found that a retrial was in the interests of justice. In the course of his opinion, Judge Leventhal cited numerous cases in which appellate courts, acting under their inherent power or under practice acts recognizing their power to affirm, reverse or modify, have reduced the degree of the offense and have either modified the sentence or remanded for lower court modification. 382 *F. 2d,* at 140–141; see *People v. Monaco,* 14 *N. Y. 2d* 43, 248 *N. Y. S. 2d* 41, 197 *N. E. 2d* 532 (1964); *Ritchie v. State,* 243 *Ind.* 614, 189 *N. E. 2d* 575 (1963); *State v. Braley,* 224 *Or.* 1, 355 *P. 2d* 467 (1960); *Forsha v. State,* 183 *Tenn.* 604, 194 *S. W. 2d* 463 (1946); *State v. Porello,* 138 *Ohio St.* 239, 34 *N. E. 2d* 198 (1941); *State v. Jackson,* 198 *Minn.* 111, 268 *N. W.* 924 (1936).

The foregoing approach is fair and sensible and clearly furthers the sound administration of justice. Retrial is burdensome to the judicial system and costly to the parties and, as here, may involve serious danger of miscarriage.

Where the interests of justice may truly be satisfied by a less wasteful alternative which does not prejudice the defendant, it should of course be followed as in *Frady* and *Austin*. Though self-limiting decisions by state courts may readily be cited,[4] it is worthy of note that they were not rendered under modern constitutions like New Jersey's 1947 Constitution; in any event reference may with equal readiness be made to other state court decisions which have gone much further in modifying sentences on appeal than we are called upon to do here. See, *e. g., State v. Ramirez, supra,* 34 *Idaho* 623, 203 *P.* 279, 29 *A. L. R.* 297; *Davis v. State, supra,* 155 *Ark.* 245, 244 *S. W.* 750; *Hubka v. State, supra,* 40 *Okl. Cr.* 161, 267 *P.* 864; *cf. State v. Hall,* 176 *Neb.* 295, 125 *N. W. 2d* 918, 926 (1964).

In *Spillers v. State, supra, —— Nev. ——,* 436 *P. 2d* 18, the defendant was convicted of rape with violence and his penalty was set by the jury at death. On appeal, the Supreme Court of Nevada sustained the defendant's contention that the Nevada statute was unconstitutional insofar as it authorized a death penalty where the defendant was tried by a jury but not where he pleaded guilty or was tried before a judge alone on a waiver of jury with the state's consent.[5] However, the court did not set aside the conviction or order a new

---

[4] See Mueller, *supra,* 15 Vand. L. Rev. at *pp.* 684–685:

Some statutes employing the term "modify" have been construed as not authorizing appellate courts to *modify* excessive sentences. It might be asked, however, what "modify" means if it does not mean "to modify." It would seem that lack of statutory authorization cannot be seriously argued where such terminology is used.

[5] We need not here determine whether the constitutional infirmity found in *Spillers* applies to New Jersey's statutory scheme. See *N. J. S.* 2A:113–4; 2A:113–3; *State v. Sullivan,* 43 *N. J.* 209, 247 (1964), *certiorari* denied, 382 *U. S.* 990, 86 *S. Ct.* 564, 15 *L. Ed. 2d* 477 (1966); *State v. Reynolds,* 43 *N. J.* 597, 603 (1965); *In re Ernst's Petition,* 294 *F. 2d* 556, 560–562, *certiorari* denied, 368 *U. S.* 917, 82 *S. Ct.* 198, 7 *L. Ed. 2d* 132 (1961). *But see United States v. Jackson,* 262 *F. Supp.* 716 (*D. Conn.* 1967), reversed, 390 *U. S.* ——, 88 *S. Ct.* 1209, 20 *L. Ed. 2d* 138 (1968). If it does apply, the result we have reached in the case at hand would call for no alteration.

trial but modified the judgment of conviction by reducing the death penalty to a sentence of 20 years to life, saying:

NRS 177.240 invests this court with authority to "reverse, affirm, or modify the judgment appealed from." The sentence imposed is a part of the judgment. Allgood v. State, 78 Nev. 326, 372 P. 2d 466 (1962); Ex parte Salge, 1 Nev. 449 (1865). Thus, we may modify an unauthorized sentence and substitute therefor any proper sentence that was open to the sentencing court. State v. Moore, 48 Nev. 405, 233 P. 523 (1925); State v. Johnson, 75 Nev. 481, 346 P. 2d 291 (1959); see also State v. Squier et al., 56 Nev. 386, 54 P. 2d 227 (1936). 436 *P. 2d* at *p.* 23.

In *Commonwealth v. Aljoe*, 420 *Pa.* 198, 216 *A.* 2d 50 (1966) the court, distinguishing *Commonwealth v. Smith*, 405 *Pa.* 456, 176 *A.* 2d 619 (1962), reduced a jury's death penalty because the prosecutor in his summation at the trial had improperly injected considerations of parole. 216 *A.* 2d, at *p.* 56. In the earlier case of *Commonwealth v. Garramone*, *supra*, 307 *Pa.* 507, 161 *A.* 733, the trial judge had fixed the penalty at death pursuant to a statute which authorized him to impose either death or life imprisonment. On appeal, the Pennsylvania Supreme Court examined the record and concluded that the circumstances did not justify the judge's exercise of his discretion in favor of the more severe penalty. In the course of his opinion, Justice Linn stated that there was "no doubt" as to the court's power to reduce the penalty "from death to life imprisonment" which it proceeded to do. 161 *A.*, at *p.* 735. See also *Commonwealth v. Green*, 396 *Pa.* 137, 151 *A.* 2d. 241 (1959). In other states similar action has been taken where the death sentence was fixed by the jury rather than the judge. See *State v. Ramirez, supra*, 34 *Idaho* 623, 203 *P.* 279; *Davis v. State, supra*, 155 *Ark.* 245, 244 *S. W.* 750; *Hubka v. State, supra*, 40 *Okl. Cr.* 161, 267 *P.* 864.

In *Ramirez*, the defendant was found guilty of murder in the first degree. The jury set the punishment at death under a statute which provided that every person guilty of murder in the first degree shall suffer death or be punished by

imprisonment for life as the jury decides. On appeal, the court found that while the evidence established guilt it was "not sufficient to warrant the extreme penalty of the law"; accordingly, it modified the judgment by reducing the sentence to life imprisonment. In response to the contention that the appellate court's power to "reverse, affirm or modify" did not extend to a case where the jury rather than the court had fixed the punishment, it made the following comments which are persuasive here:

> We perceive no logical reason why the judgment of the jury should be more potent than that of the court, and why this court may review the latter but not the former, in so far as it relates to the penalty to be inflicted. Nor why the evidence may be reviewed to determine its sufficiency to support the verdict, but not to determine whether it justifies the infliction of the death penalty. Nor why, in a case where there was error in the record, but not of such a character as to warrant a reversal, in order to avoid the imposition of the extreme penalty when not warranted by the evidence, this court should be put to the alternative of reversing the judgment nevertheless or of permitting injustice to be done. Considerations of both reason and justice uphold the proposition that this court may modify a judgment where the jury has found the defendant guilty of murder in the first degree and fixed the punishment at death, when the furtherance of justice requires such modification. 203 *P.* at *pp.* 282–283.

See *State v. Goodyear,* 98 *Ariz.* 304, 404 *P. 2d* 397, 410 (1965), reversed on other grounds, 100 *Ariz.* 244, 413 *P. 2d* 566 (1966); *State v. Valenzuela,* 98 *Ariz.* 189, 403 *P. 2d* 286 (1965); *ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences, supra,* at *p.* 17.

*In Fritz v. State, supra,* 8 *Okl. Cr.* 342, 128 *P.* 170, the jury found the defendant guilty of murder. The statutory penalty was either death or life imprisonment and the jury fixed it at death. On appeal, the court modified the conviction by affirming the finding of guilt and reducing the penalty to life imprisonment. In response to the contention that its action intruded on the Governor's commutation power, the court had this to say:

The power of this court to modify a judgment inflicting the death penalty for murder to imprisonment for life at hard labor when deemed proper in the furtherance of justice is in no sense the power of commutation of the sentence of the lower court. Commutation can be granted only by the chief executive of the state, and is granted as a matter of clemency. The judicial power to modify a judgment and sentence and the executive power to pardon, parol, or commute are wholly distinct in their nature. The one is an award of justice and the other is an act of grace. Commutation is a matter of discretion and may be refused. Justice is imperative, and must not be denied. The fact that the Governor has the power to commute does not abridge the defendant's right to appeal to this court for relief. In other words, this provision of our criminal procedure act makes it the duty of this court to review the record, and in a proper case, if necessary in the furtherance of justice, modify the judgment so as to prevent the imposition of punishment which the evidence will not warrant. 128 *P.* at *p.* 177.

In *Williams v. State, supra,* 183 *Ark.* 870, 39 *S. W. 2d* 295 the defendant killed a policeman during the course of a robbery. The jury found him guilty of murder and fixed the sentence at death rather than life imprisonment. On appeal, it appeared that evidence relating to the defendant's previous criminal conduct had been erroneously admitted during the trial. It was found that this error did not impair the judgment of guilt although it may have prejudiced the defendant on punishment. The Arkansas Supreme Court held that, unless the prosecutor notified it that he elected to proceed with a full retrial, it would modify the conviction by reducing the punishment to life imprisonment. 39 *S. W. 2d,* at *p.* 297. The procedure in *State v. Sorrentino,* 31 *Wyo.* 129, 224 *P.* 420, 426–427 (1924) was along the same line. See Hall, *supra,* 37 Colum. L. Rev., at *pp.* 774–775; *cf. Brown v. United States,* 112 *U. S. App. D. C.* 57, 299 *F. 2d* 438, 440 (*D. C. Cir.*), *certiorari* denied, *Thornton v. United States,* 370 *U. S.* 946, 82 *S. Ct.* 1593, 8 *L. Ed. 2d* 812 (1962); *State v. Berger,* 72 *Wyo.* 422, 265 *P. 2d* 1061, 1068 (1954).

██ Reference to New Jersey's constitutional and legislative history, along with the cited out-of-state decisions and their obvious good sense, has left us firmly convinced of the

sufficiency of our appellate power to modify a discretionary sentence whenever the interests of justice so require. Since the exercise of discretion is involved it should matter not a whit that the sentencing is by the jury rather than the judge. Indeed it has been suggested elsewhere that since sentencing in each case by a different jury contributes significantly to unfounded disparity between sentences, there is "all the more reason for judicial review in those cases where the jury participates in sentencing." *ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences, supra,* at *p.* 17. But the matter need not be pursued for the issue before us is a narrower one and our holding may properly be confined to its disposition. Here there was a legal error relating to the sentence alone and the prosecutor, assuming as we find that a new trial on punishment alone is unavailable, seeks modification rather than retrial; in effect the death penalty is being waived. It undoubtedly could have been waived before and during the trial (*In re Waiver of Death Penalty, supra,* 45 *N. J.* 501) and there is no rational basis for denying the power to waive now. Indeed it may be noted that since the filing of the earlier opinion in this case (50 *N. J.* 159) a formal practice rule has been adopted which very broadly provides that "the prosecutor with the approval of the court may waive the death penalty." *R. R.* 3 :1–3A.

We entertain no doubts as to the validity of the administrative directive which bore on the prosecutor's authority to waive the death penalty. 45 *N. J.* 501. Historically the prosecutor has been vested with broad discretionary powers to be exercised in the conscientious discharge of the manifold responsibilities of his office. See *State v. LeVien,* 44 *N. J.* 323, 326–327 (1965); *cf. Newman v. United States,* 382 *F.* 2d 479, 480–482 (*D. C. Cir.* 1967); *United States v. Shaw,* 226 *A.* 2d 366 (*D. C. App.* 1967); 28 Mont. L. Rev. 41 (1966); 60 Nw. U. L. Rev. 174 (1965); 103 U. Pa. L. Rev. 1057 (1955). He may in appropriate circumstances determine that a murder indictment is not called for at all

(*State v. LeVien, supra,* 44 *N. J.,* at *pp.* 326–337) ; he may seek and obtain a second degree (*N. J. S.* 2*A* :113–2) or a manslaughter (*N. J. S.* 2*A* :113–5) rather than a first degree indictment; he may seek and obtain a dismissal or *nolle pros.* of a first degree or lesser indictment (*State v. Hickling,* 45 *N. J. L.* 152, 154 (*Sup. Ct.* 1883) ) ; and he may recommend and obtain acceptance of a plea by a defendant to a murder indictment (*N. J. S.* 2*A*–113–3) though a plea of a codefendant has been rejected. See *Newman v. United States, supra,* 382 *F. 2d* 479; *cf.* Bedau, *Death Sentences in New Jersey,* 19 Rutgers L. Rev. 1, 30 (1964).

In all of the cited instances a jury finding of first degree murder without recommendation is of course avoided. At no time has the Legislature questioned the breadth of the general prosecutorial authority nor has it ever cast any shadow on the specific prosecutorial authority to waive the death penalty in a murder case. Such authority was explicitly recognized in our unanimous directive (*In re Waiver of Death Penalty, supra,* 45 *N. J.* 501) and has in effect been recognized in cases elsewhere. See *Williams v. State, supra,* 183 *Ark.* 870, 39 *S. W.* 2*d* 295; *State v. Sorrentino, supra,* 31 *Wyo.* 129, 224 *P.* 420. It finds strong support not only in the legalities but on any considered view of the realities. As a practical matter, whenever the prosecutor decides not to ask for the death penalty he may so tell the jury and that effectively eliminates its return. That being true, it would be utterly wasteful and needlessly burdensome to conduct the trial as though it were a capital case and thereby entail extensive *voir dire* examinations as to the prospective jurors' views on capital punishment. There can be no question that the directive furthered, as it said, the public interest and "the fair and expeditious administration of criminal justice." 45 *N. J.,* at *p.* 502. It has been implemented in the court rules (*R. R.* 3 :1–3*A; R. R.* 3 :7–2(*f*) ), has operated with great satisfaction, and is now unhesitatingly reaffirmed.

We are satisfied that a new trial on punishment alone would not be appropriate. See *Frady v. United States, supra,*

348 *F. 2d*, at *p.* 90. Obviously, the old jury could not now be reconstituted; indeed at oral argument counsel for the defendant Washington advised that since the trial, one of the jurors had become his client. Nor could a new jury pass on the matter of punishment alone without being familiar with "all the evidence" (*N. J. S. 2A*:113–4; *State v. Molnar, supra,* 133 *N. J. L.,* at *p.* 334) ; that includes all the evidence bearing on the defendants' commission of the crime. See *State v. Mount, supra,* 30 *N. J.,* at *pp.* 215–220. It is conceded that the State would be unable to produce all of the witnesses at the original trial, and any suggestion that a new jury could fairly be called upon to read the many thousands of pages of testimony at the former trial, in lieu of hearing live witnesses, would appear to be too unrealistic to require discussion.

In any event, our present practice does not provide for bifurcated trials, and the opinion which found no prejudicial error relating to guilt in the record of the original trial, was clearly rendered on the premise that no death penalty would be rested on that record and that the choice would be between a modification by this Court or a full retrial. 50 *N. J.,* at *pp.* 188–189 ; see *Appellate Review of Sentencing Procedure,* 74 Yale L. J. 379, 388, n. 52 (1964). See also *Meszaros v. Gransamer,* 23 *N. J.* 179, 188–189 (1957) ; *State v. Mount, supra,* 30 *N. J.,* at *p.* 213. Whether bifurcation should be adopted for the future is something which need not be dwelt upon here, for the subject patently calls for thorough study including examination of the actual experiences to date in the several states which have such proceedings. The results of such study and examination will undoubtedly warrant presentation in regular course at a forthcoming judicial conference. *R. R.* 1:23 ; see Note, *The Two-Trial System in Capital Cases,* 39 N. Y. U. L. Rev. 50 (1964).

In his separate opinion in *Frady v. United States, supra,* Judge Burger, after referring to difficulties incident to bifurcated trials, said: "This enumeration of a few of the

problems confronting the designers of any two-trial system should make clear the utter folly of institution of such a system except after careful study of all its ramifications. We have not made such a study and we are not equipped to do so in the resolution of an appeal." 348 *F. 2d,* at 116; *cf Spencer v. State of Texas,* 385 *U. S.* 554, 567, 87 *S. Ct.* 648, 655, 17 *L. Ed. 2d* 606, 616 (1967) ; *United States v. Jackson, supra,* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d* 138. In *United States v. Curry,* 358 *F. 2d* 904 (2 *Cir.*), *certiorari* denied, 385 *U. S.* 873, 87 *S. Ct.* 147, 17 *L. Ed. 2d* 100 (1966) it was suggested that, in the absence of a congressional enactment to the contrary, the federal courts would have inherent procedural power to order bifurcated trials; but the court indicated that since such trials do not always work to the advantage of defendants it would be "loath to compel unwilling defendants to submit to a procedure which is devised for their benefit but which may be prejudicial in its application to a particular case." 358 *F. 2d,* at *p.* 914; see *United States v. Jackson, supra,* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d* 138;[6] *Pope v. United States,* 372 *F. 2d*

[6] In *Jackson* the Supreme Court, in striking the death penalty provision of the Federal Kidnaping Act 18 *U. S. C.* § 1201(a), declined to construe the Act as authorizing bifurcated trials. In the course of his opinion for the Court, Justice Stewart reiterated the problems which had been listed by Judge Burger in *Frady v. United States, supra,* 348 *F. 2d* at *p.* 116 and made the following comment:

Even in States with legislatively established jury proceedings on the penalty issue, defense attorneys have not always been prepared to take advantage of those features of the penalty trial designed to benefit their clients. See Note, Executive Clemency in Capital Cases, 39 N. Y. U. L. Rev. 136, 167 (1964). If the relative novelty of penalty proceedings has thus impaired effective representation in jurisdictions where the contours of such proceedings have been fixed by statute, it seems clear that the difficulties for the defense would be even more formidable under the amorphous case-by-case system that the Government asks us to legitimize today. It is no wonder that the Second Circuit, while not foreclosing two-stage trials altogether, was "loath to compel unwilling defendants to submit" to them. *United States v. Curry,* 358 *F. 2d* 904, 914. 88 *S. Ct.* at *p.* 1216, n. 19.

710, 728–730 (8 *Cir*. 1967). Needless to say, Laws and Washington are such "unwilling defendants"; in the light of their prior criminal records a retrial limited to punishment alone would inhumanely be death oriented. See 39 N. Y. U. L. Rev. 136, 167 (1964). Understandably their present position is that they should have a full retrial on both guilt and punishment but, as we have already indicated, that would disserve rather than advance the proper administration of justice. *Cf.* 50 *N. J.,* at *pp.* 187–189; *Frady v. United States, supra,* 348 *F. 2d* 84.

▮ Judicial reluctance to exercise the general appellate modifying power where sentence is concerned has been attributed to long-abandoned aspects of English criminal law which fortunately never had any counterparts in American criminal law. There is little basis for perpetuation of this reluctance, particularly in an enlightened State with a modern judicial structure such as ours. The delegates who drafted the 1947 Constitution deliberately vested this Court with sweeping judicial power to the end that it would be fully equipped to see that justice is soundly administered. Surely, if we are to keep their faith and match their vision, the power may not be found wanting here. The defendants were adjudged guilty of murder in the first degree on wholly sufficient evidence. They had a fair trial which was free from any prejudicial error relating to guilt. There was a sentencing error which may have brought about the death sentences but modification of the penalty to life imprisonment will now remove all possibility of harm from that error. Right and justice call for no greater relief to the defendants whereas the new trial they seek would be a clear imposition on society and might well bring about a gross miscarriage of justice. Under all of the circumstances including the prosecutor's waiver of the death penalty, we have no hesitancy in concluding that there is adequate appellate power to modify the judgments of conviction, as we now do, so that each of the defendants will stand con-

victed of murder in the first degree with sentence of life imprisonment.

Modified.

PROCTOR, J. (concurring). I join the majority in voting to reduce the sentence in this case to life imprisonment only because the prosecutor has agreed to waive the death penalty. Although the prosecutor did indicate at the oral argument that he would prefer a remand of the case on the issue of punishment alone, he made it abundantly clear that if we decided against a partial remand, he did not wish a reversal of the conviction but rather would prefer that the Court permit a waiver of the death penalty and a reduction of the sentence to life imprisonment. In *In re Waiver of Death Penalty*, 45 *N. J.* 501 (1965) this Court announced that the prosecutor does possess the power to effect a binding waiver of the death penalty. See *R. R.* 3 :1–3*A*. This administrative order, in my view, does no more than recognize the realities of the situation which arises when the prosecutor does not seek the death penalty and I agree with the majority here that the exercise of this power is valid. If the prosecutor decides not to request the death penalty, his presentation of the State's case and his request to the jury that a death sentence not be returned will generally lead to a jury recommendation of life imprisonment if a guilty verdict is returned. In light of this great probability, approaching certainty, that the unwanted death penalty would not be imposed, the question whether the prosecutor's waiver is legally binding on the jury becomes moot. The reality of the situation is that the waiver, whether considered binding or not, will in practice virtually eliminate the death penalty from the case. Indeed, were a jury to return a death penalty despite a "non-binding waiver" of that penalty by the prosecutor and a favorable charge by the court consonant with such waiver (as Justice Francis' dissent recognizes could be done), it well might be argued that the death verdict was influenced by prejudice, passion, or mistake. Since this is so, we ought recognize,

as we did in our administrative directive, *supra,* that the waiver is binding, so that time consuming procedures required only in capital cases — such as a *voir dire* examination of the prospective jurors relating to their views on capital punishment — can be eliminated from the case. This power of the prosecutor to waive the death penalty is consistent with his broad power to seek an indictment for a lesser degree of murder or to *nolle pros.* an indictment returned.

Accepting as I do the permissibility of a binding pretrial waiver of the death penalty by the prosecutor, I have no difficulty in concluding that, with our approval, he may exercise that power at this posture of the case. Certainly, if we remanded this case for a complete new trial, the prosecutor could waive the death penalty or request the jury to return a life sentence in a manner practically eliminating the possibility of the death sentence penalty. As Justice Jacobs points out, the interests of justice are best served by permitting that waiver to be made now rather than requiring a retrial.

However, if, as my dissenting colleague fears, the majority opinion may be read to imply that this Court has inherent power to substitute its discretion for that of the jury and to reduce a death sentence to life imprisonment over the prosecutor's objection, I cannot join in the majority opinion. In the absence of the waiver by the prosecutor, I would vote to remand this case for a plenary new trial. Although I have no doubt that this Court has the power to reduce, as excessive, sentences in cases in which the Legislature has left the matter of sentencing (within minimum and maximum limits) to the judiciary's discretion, I do not believe the power extends to first degree murder cases. *N. J. S.* 2A :113–4 prescribes the death penalty as the punishment for first degree murder, subject only to the jury's power to "exercise clemency" (Statement attached to bill which became *L.* 1916, *c.* 270) by recommending life imprisonment. Nowhere in the statute is there any indication that judges, trial or appellate, are to have any power to circumvent the gen-

eral penalty of death. In many of the authorities cited by the majority, as well as in all the decisions in this State, appellate power to modify a sentence is limited to the imposition of the proper sentence which the trial judge was empowered to impose originally. In a first degree murder case, however, the Legislature has made it clear that the trial judge has no power to determine whether the sentence should be life or death; the Legislature has mandated that this decision is strictly for the jury.

The death penalty in this case may not stand because the trial court erred in its charge to the jury on sentencing, and not because this Court disagrees with the jury's verdict on an evidentiary level. The statutory language, in my opinion, forecloses the possibility that this Court could reduce a death sentence merely because we felt that had we been jurors we would have recommended life imprisonment in place of what we considered to be an excessive penalty imposed by a jury.[1]

As Justice Francis' dissenting opinion reveals, many of the problems in this area might be eliminated by a bifurcated trial on guilt and punishment. Although I see much to commend the adoption of such a procedure for this State, I would reserve decision on the matter. In my opinion, such a drastic innovation is not a fit subject for adoption in the decision of an appeal, but rather should be adopted, if at all, as a formal rule of law after thorough deliberation outside the context of a specific case. This deliberation should include consideration whether legislation would be needed to effect the change. Accordingly, I request that we place the question on the agenda of the next judicial conference.

Justice HANEMAN joins in this opinion.

---

[1] I do not express a view here inconsistent with this Court's power to set aside a death sentence as against the weight of the evidence and order a complete new trial. In such a case, moreover, the prosecutor well might wish, as here, to waive the death penalty, eliminating the necessity for a new trial.

FRANCIS, J. (dissenting). In my judgment this Court has no authority in a first degree murder case to set aside a jury-fixed mandatory death penalty and to substitute a sentence of life imprisonment. Under the circumstances present in this case, the judicial function must be limited to an order for a new trial on all issues or for a new trial on the issue of punishment alone. Moreover, even assuming the Court does have certain power to commute the death sentence and impose one of life imprisonment, it is acting beyond its power in doing so here because it has disregarded completely the standard set out in the statute for choosing between the two penalties. The choice between the two penalities must be made in my view, by the jury alone, but in any event "upon and after the consideration of all the evidence [in the case]." *N. J. S.* 2A :113–4. Neither the majority opinion nor any member of the majority says the decision to change the death sentences to life imprisonment was based upon a consideration of the evidence.

I

The testimony reveals that a short time before April 26, 1965, Laws and Washington and others planned to hold-up the Public Service Coordinated Transport Company Terminal at Oradell, N. J. On April 18, following a discussion about guns, a single-barrel shotgun was produced. Laws showed Washington how to handle it and told him that "if it was at all necessary to use the gun by no means hesitate." On April 26 at about 3 :00 A.M. three men, two of whom the jury found to be Washington and Laws, held up the terminal. While the robbery was in progress, Christopher Jaeger, a bus driver, came on the scene. On Jaeger's appearance, Washington, faithful to Laws' earlier admonition, did not hesitate. He blew part of Jaeger's head off with a shotgun blast. A large portion of the skull was found some distance from the main part of the body.

The killing of Jaeger was murder in the first degree. *N. J. S.* 2A :113–2. At this point it should be noted that

the power to prescribe the penalty to be inflicted for a particular crime rests with the legislative branch of government, not with the courts. This power is part of the sovereign right of the State to maintain social order and to take life or liberty when deemed necessary in the interest of that order. The wisdom or propriety of punishment thus established (within constitutional limits, not involved in this case) is not a matter for judicial consideration. When the Legislature fixes a single or mandatory penalty for a particular crime, the courts have no alternative but to pronounce the prescribed sentence. It is only when the lawmakers have provided for minimum and maximum limits of punishment to be applied by the judicial department that judges have discretion as to the punishment to be administered. *State v. Orlando,* 119 *N. J. L.* 175, 184 (*Sup. Ct.* 1937); *State v. Griffin,* 84 *N. J. L.* 429, 432 (*Sup. Ct.* 1913), affirmed, 85 *N. J. L.* 613 (*E. & A.* 1914); *Mack v. State,* 203 *Ind.* 355, 180 *N. E.* 279 (1932); 4 *Warren on Homicide* § 395, *p.* 687 (*Perm. ed* 1938); 21 *Am. Jur. 2d, Criminal Law,* § 577. The fact that the Legislature prescribed a punishment more severe than the courts approve affords no ground for judicial interference. If the rule were otherwise, then mandatory sentences generally establishd by our Legislature could be disregarded by the courts, and a suspended sentence or a sentence of probation imposed.

The Legislature has ordained as punishment for murders such as that of Jaeger that the killer "shall suffer death * * * unless the jury shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend life imprisonment, in which case this and no greater punishment shall be imposed." *N. J. S.* 2A:113–4.

There can be no doubt that if the statute ended after the phrase "shall suffer death," that punishment would be mandatory. If the Legislature had not made provision for any other penalty, the judicial branch of the government would be bound by the mandate. If on appeal from such a death sentence trial error appeared in the record, the au-

thority of the appellate tribunal to rectify the error would be limited to an order for a new trial. Obviously a life imprisonment sentence could not be substituted for the death penalty. The Legislature, however, in adopting the statute in its present form, did establish a qualification — a single qualification — on its mandate compelling the death penalty for first degree murder. It is that the murderer shall suffer death unless the jury upon and after a consideration of all the evidence shall recommend life imprisonment. In my judgment, this qualification does not grant to the judiciary any greater authority than it had before the qualification was added. All the Legislature did, and in my view all it intended to do, was to give the jury the authority to lower the death penalty to life imprisonment if in *its* judgment — not the court's judgment, either trial or appellate — the evidence was such that clemency should be shown. On appeal from a death sentence, the authority of the court remained the same as before the qualification was added by the lawmakers. If trial error of any kind was shown, either on the guilt or innocence or penalty aspect of the case, which was prejudicial to the defendant's right to a fair trial according to law, there is not the slightest indication that the Legislature intended to empower the courts to substitute a life sentence for the death sentence which the jury verdict made mandatory. In such case, the courts' authority should be considered confined to (a) ordering a retrial on all issues in the case, or (b) as will be discussed in detail hereafter, ordering a new jury trial on the issue of punishment whenever the trial error goes to that issue alone and cannot be said to have had any adverse influence on the guilt aspect of the case, which aspect is clearly settled by the verdict of the jury.

It should be noted that the basic problem involved here is not novel. This Court dealt with it expressly in *State v. White*, 27 *N. J.* 158 (1958). There the defendant's guilt of murder in the first degree was clear, and the jury returned such a verdict. During its deliberations, however,

the jury, as in this case, inquired of the court about the possibility of parole if a verdict recommending life imprisonment were returned. Again as in this case, the court gave erroneous instructions on the subject. On appeal this Court reversed the conviction and ordered a new trial on all issues. The opinion does not give any indication that the Court felt it possessed authority to convert the death sentence into one of life imprisonment. The same course should be taken here, unless as an alternative, which I believe is warranted, a remand is made for retrial of the matter of punishment alone. The majority opinion brushes aside *State v. White* saying the issue of this Court's authority to change a death verdict to life imprisonment was not raised. So here, no party to the proceeding raised the issue. It was injected *sua sponte* by the majority.

The history of the homicide section of the Crimes Act relating to the punishment for murder, *N. J. S.* 2*A*:113–4, reveals a total absence of support for the action taken by the majority in this case. In New Jersey, under the common law and the early statutes, no degrees of murder were recognized. On conviction of murder or plea of guilty, there was but one punishment. The Legislature made it mandatory — death. *Paterson, Laws of New Jersey,* 1796, *p.* 208, 1821 Revision *p.* 245, 262. I have searched in vain for an intimation in case or statutory law that a court, trial or appellate, could disregard that mandate, and order life imprisonment. In fact, in early times judges endeavored to dissuade an accused from pleading guilty to an indictment for murder, because by the plea he condemned himself to death. As Chief Justice Beasley said in *State v. Genz,* 57 *N. J. L.* 459, 462 (*Sup. Ct.* 1895), such a plea "merely provided a ready and facile road to the gallows."

In 1874 the Legislature modified this harsh rule by authorizing the court, on a plea of guilty of murder, to proceed by examination of witnesses to determine the degree of the crime and to "give sentence accordingly." New Jersey Revision, 1709-1877, Crimes §§ 68, 69, *p.* 239. If after

such hearing the court found the offense to be second degree murder (which was defined in general terms), the punishment of imprisonment for the term prescribed was imposed. But if first degree murder was found, a death sentence was mandatory. New Jersey Revision, 1709–1877, Crimes *p.* 239. In *Hallinger v. Davis,* 146 *U. S.* 314, 13 *S. Ct.* 105, 36 *L. Ed.* 986 (1892) the defendant pleaded guilty to an indictment for murder. After a hearing as provided by the statute, the court found him guilty of first degree murder and sentenced him to death. The United States Supreme Court found no constitutional infirmity in the procedure, even though there was no right to jury trial on such a hearing. Whenever a murder indictment went to trial on a plea of not guilty, the jury upon convicting the defendant was required to designate by its verdict whether the offense was first or second degree murder (unless, of course, only first degree murder was involved, as in a strict felony-murder case). At this time the jury had no authority to make a recommendation of life imprisonment.

In 1893 the court's authority to impose the death sentence on a plea of guilty was withdrawn. Section 68 of the Crimes Act was altered so as to ban the plea of guilty and to authorize the court in its discretion to accept a plea of non-vult in which event "the sentence to be imposed * * * shall be the same as that imposed upon a conviction of murder of the second degree." *L.* 1893, *c.* 36, *p.* 83. This statute provided also, as it does today, that if a plea of guilty was offered thereafter, "it shall be disregarded, and the plea of not guilty entered." In such event, as when a plea of not guilty was entered by the accused, a jury "shall try the case." *N. J. S.* 2A:113-3. Obviously the intention of the Legislature in 1893 was to change the rule exemplified by the death sentence imposed on a plea of guilty in *Hallinger v. Davis, supra,* and to remove the death penalty from the court's control. *State v. Sullivan,* 43 *N. J.* 209, 245–246, *certiorari* denied, 382 *U. S.* 990, 86 *S. Ct.* 564, 15 *L. Ed.* 2d 477 (1966). Thereafter, unless the trial court accepted

a plea of non-vult in homicide cases, the issue of guilt or innocence went to the jury, and on a verdict of first degree murder the court was obliged to impose the death penalty. If prejudicial error of any kind occurred at the trial, the appellate court's only authority was to grant a new trial.

In 1916, following agitation for abolition of the death penalty, the statute was again amended to provide that every person convicted at trial of murder in the first degree "shall suffer death *unless* the jury at the time of rendering the verdict in such case shall recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed." *L.* 1916, *c.* 270, *p.* 576. The legislative purpose was not to alter the court's lack of power, trial or appellate, to interfere with the mandatory death penalty. The statement on the bill when introduced makes this plain:

"The purpose of this amendment is to make it possible *for the jury*, in rendering a verdict of murder in the first degree, to exercise clemency in any case where the death penalty seems too severe under the facts shown in that particular case." (Emphasis added.)

But for this amendment, the matter of clemency or commutation in such cases rested, and continues to rest, with still another branch of the government, the Governor. *N. J. S.* 2A:167-2. The last change, made in 1919, brought the act substantially to its present form, *i. e.,* that a person convicted of murder in the first degree shall suffer death "*unless the jury* shall by its verdict, and as a part thereof, *upon and after the consideration of all the evidence,* recommend life imprisonment. * * *" (Emphasis added.) *N. J. S.* 2A: 113-4. See *R. S.* 2:138-4; *L.* 1919, *c.* 134, *p.* 303.

The evolution of the Homicide Act, *N. J. S.* 2A:113-1,-4, over the years discloses no legislative disposition to confer on the courts, trial or appellate, any authority to fix the extent of punishment as between life imprisonment and death. The statute as a matter of substantive law gives that power to the jury alone. The Court of Errors and Appeals,

in speaking of the 1919 change in *State v. Molnar*, 133 *N. J. L.* 327, 335 (*E. & A.* 1945) said:

"The statutory punishment for first degree murder is death, *subject only* to the condition that the jury in its absolute discretion chooses to recommend imprisonment at hard labor for life; a recommendation that shall *not* be made, however, except after consideration of all the evidence and by incorporating the recommendation in the verdict of guilt." (Emphasis added.)

This Court, in *State v. Mount*, 30 *N. J.* 195, 210 (1959) agreed with *Molnar*:

"Thus the jury in the instant matter had the sole responsibility of passing on life or death, and it was its solemn obligation to deal with that issue without at all considering the possibility of an appeal to this court; indeed, the appeal to this court is necessarily confined to matters other than the wisdom or justice of the withholding of the recommendation of life imprisonment *which the statute has effectively placed in the absolute discretion of the jury upon its consideration of all the evidence.*" (Emphasis added.)

Somewhat later, in referring to the same matter, this Court spoke of the absolute discretion of the jury to fix the penalty at life imprisonment rather than death as being limited only by the requirement that its decision be made "upon and after consideration of all the evidence." *State v. Johnson*, 34 *N. J.* 212, 230, *certiorari* denied 368 *U. S.* 933, 82 *S. Ct.* 370, 7 *L. Ed. 2d* 195 (1961).

In *State v. Mount* the Court, after referring to the divergent views about capital punishment, said also:

"With due regard for the opposing views, our Legislature has fixed the State's policy by providing, in effect, that the jury shall have absolute discretion to determine in the particular case before it and upon the basis of all the evidence before it whether justice will be better served by the imposition of life imprisonment rather than the penalty of death. If this legislative policy is to be given the sympathetic sweep to which it is entitled, our trial judges will carefully avoid action calculated to sway the jury in its choice of punishment and our appellate judges will carefully avoid rulings which have a comparable effect." 30 *N. J.*, at *p.* 220.

I repeat that prescribing the penalty for murder is a prerogative of the Legislature. When prescribed in terms of a mandatory single penalty, the mandate is one of substantive, not procedural law, and it is beyond the hand of the Court. Although the 1947 *Constitution, Art.* VI, § II, ¶ 3, gave this Court sole authority to make rules of practice and procedure, the grant was subject to substantive law. In this connection the admonition of the late Chief Justice Vanderbilt in *Winberry v. Salisbury,* 5 *N. J.* 240, 248, *certiorari* denied, 340 *U. S.* 877, 71 *S. Ct.* 123, 95 *L. Ed.* 638 (1950) must be heeded. He said the phrase "subject to law" should be a continuous reminder that our rule-making power must not be exercised so as to invade the field of substantive law through decisions in cases presented on appeal. The majority opinion here grieviously trespasses on the Legislature's substantive declaration as to the punishment for first degree murder, and as to the agency which shall decide it.

No dispassionate reader of the opinion of the majority of my colleagues can avoid the conclusion that they are ruling expressly that this Court has the authority to change a death sentence, mandatorily imposed by a trial court after a jury verdict of guilt of murder in the first degree, to a sentence of life imprisonment. There is some reference to a so-called waiver of the death penalty by the prosecutor during argument of the appeal. But this is a mere judicial fillip. I am without doubt that in the future this case will be utilized as a precedent for vacating a death sentence and substituting one of life imprisonment even when the prosecutor strenuously objects to such court action. See *infra.* In fact, the language employed in the present opinion makes plain that the death sentence would have been changed to life imprisonment if the matter of waiver had never been mentioned.

Much of the forepart of the majority opinion is devoted to establishing the principle that this Court has authority to reduce a sentence of imprisonment imposed by a trial court in terms of a minimum and a maximum period of years.

The thesis projected is that a sentence may be excessive in a given case and therefore illegal, even though within the minimum and maximum limits fixed by the Legislature. Although our Court has not had occasion to reduce such a sentence, unquestionably the power to do so is present. An excessive sentence is an illegal one and I have always felt that the judicial authority either to send the cause back to the trial court to reassess the penalty, or to reduce it at the appellate level, was not open to serious question. Such action is within the legislative prescription which empowered the judicial department to impose a sentence between the minimum and maximum limits. The legal propriety of a trial court's sentence although within those boundaries is certainly a matter for appellate review.

But that is not the situation here. The Legislature has established one mandatory penalty for murder in the first degree—death. The trial court had no alternative but to impose it when the jury returned a first degree verdict. The power to impose life imprisonment is conferred by the statute on the jury alone, and "unless" they, and they alone, after considering all the evidence, recommend it, the death mandate applies. The limit of the trial or appellate court function after a first degree murder verdict is to determine if prejudicial legal error occurred during the trial. If so, in the present state of the law, a new trial must be ordered. As I shall suggest hereafter, as a *procedural* matter and therefore within the ambit of the Court's constitutional power, we can direct a new trial, limited to the issue of punishment, on this basis: If the trial error related to the issue of punishment alone — for example error in the exclusion of evidence of mental weakness not rising to the level of legal insanity but offered under the recently promulgated doctrine of *State v. Mount, supra,*—and the jury verdict of guilt is clearly justified and not open to any reasonable question, this Court, in my judgment, may in its discretion order a new trial as to punishment alone.

The majority relies heavily on *State v. Johnson*, 67 *N. J. Super*. 414, 432 (*App. Div.* 1961) in which Judge Gaulkin held that appellate power existed "to revise a sentence [involving an imprisonment term] where it is manifestly excessive, even though within authorized statutory limits." That rule is sound. The key to appellate action, however, is that the sentence under review be manifestly excessive although within the legislatively prescribed minimum and maximum limits. No member of the majority says the death sentence here is excessive. Obviously, it was the only sentence legislatively authorized for court imposition when the jury returned the verdict of first degree murder. In relying upon *State v. Johnson*, the majority overlooked a sentence in Judge Gaulkin's opinion:

"[T]he appellate courts have original jurisdiction to do all that needs to be done to accomplish justice, *save in those cases in which a jury trial must be had to correct error.*" 67 *N. J. Super.*, at *p.* 425. (Emphasis added.)

That qualification is a sound one, and should be applied here. Moreover it is consistent with *State v. Butler*, 27 *N. J.* 560, 597–598 (1958). In *Butler*, the defendant was convicted of first degree robbery-murder and sentenced to death. We reversed and ordered a new trial because the trial court denied a request by defendant to define the crime of robbery. On appeal, the State suggested that if the facts appearing in the record would not support a verdict of guilt of robbery, this Court should affirm the conviction by invoking "its inherent powers and sustain the verdict as one of murder in the second degree." We disposed of the suggestion summarily, saying "we have no authority to intrude upon the exclusive function of the jury."

My colleagues cite *State v. Johnson*, 34 *N. J.* 212, appeal dismissed, 368 *U. S.* 145, 82 *S. Ct.* 247, 7 *L. Ed. 2d* 188, *certiorari* denied, 368 *U. S.* 933, 82 *S. Ct.* 370, 7 *L. Ed. 2d* 195 (1961), as furnishing some support for their view. But the language of the opinion must be evaluated in the frame-

work of the case. The defendants attacked the constitutionality of *N. J. S.* 2*A*:113–4 on the ground that the statute established no standard to guide the judgment of the jury in deciding whether to recommend life imprisonment after a finding of guilt of first degree murder. We rejected the attack holding that an adequate standard was provided by the requirement that the decision of the jury to make or to withhold a recommendation for life imprisonment should be reached "upon and after a consideration of all the evidence." The Court had no intention of suggesting the existence of judicial power to take the drastic action proposed in the present case. The concurring opinion being filed here by the author of *State v. Johnson* is clear evidence of the absence of such intention.

*State v. Culver,* 23 *N. J.* 495, *certiorari* denied, 354 *U. S.* 925, 77 *S. Ct.* 1387, 1 *L. Ed. 2d* 1441 (1957), also cited by the majority, is irrelevant here. The trial court imposed a life sentence on Culver believing he was a fourth offender. Actually he had been convicted previously of only two high misdemeanors. Therefore the sentence was incorrect. Following appeal and remand for resentence, new separate sentences were imposed on the basis of the two crimes. The life sentence was vacated. Defendant appealed urging lack of jurisdiction in the trial court to resentence. This Court simply held that the trial court and an appellate court had power to correct an illegal term sentence at any time and to impose a proper one within the statutory limitations. See also, *In re Kershner,* 9 *N. J.* 471, 476, *certiorari* denied, 344 *U. S.* 844, 73 *S. Ct.* 59, 97 *L. Ed.* 656 (1952). The authority therefor evolved from *R. S.* 2:195*A*–13 of the Criminal Procedure Act incorporated substantially in Rule 1:2–19(c) in 1948, and at present in *R. R.* 1:5–1(c); also, at the trial level from Rule 2:7–13, later Rule 3:7–13, and now, although in more limited form, in *R. R.* 3:7–13(a).

*R. R.* 1:5–1(c), on which the majority opinion seems to place great reliance, is, of course, a procedural rule. It says that "if a judgment of conviction shall be reversed for error

in the sentence, the appellate court may render such judgment *as should have been rendered * * *."* (Emphasis added.) In this case there is no error in the sentence. The jury found defendants guilty of first degree murder which the majority says was amply supported by the evidence. The trial judge pronounced the only lawful sentence he could impose with that verdict. But more than this, how can this Court say that life imprisonment is the judgment that "should have been rendered"? On what procedural basis can it do so? Certainly the majority cannot say, nor do they attempt to say, that the jury, after considering all of the evidence, erred in failing to recommend life imprisonment.

The majority opinion notes that the homicide statute directs the entry of a judgment of death on a first degree murder verdict unless the jury recommends life imprisonment, "in which case this and no greater punishment shall be imposed." It points out that the statute is not "addressed in any manner to appellate proceedings after conviction." Then it points to *R. R.* 1:9–1 which says that the mandate from the appellate court (after the opinion of the court is filed) shall "merely provide that the judgment, order or determination appealed from * * * is affirmed, reversed or modified, and that the record shall be remitted to the court below to be there proceeded with in accordance with the rules and practice relating to that court, consistent with the opinion of the appellate court." How that language can be regarded as a fount of power is beyond me. Finding support there for changing a death sentence to one of life imprisonment is truly a seven league bootstrap *tour de force.* This Court has authority under the Constitution to regulate matters of procedure, but we cannot confer power upon ourselves to make or to emasculate substantive law.

In other jurisdictions appellate courts hold that statutes, either the same as or of precisely the same import as *N. J. S.* 2A:113–4, vest the jury with absolute discretion to recommend life imprisonment or to withhold the recommendation

after finding an accused guilty of murder in the first degree. In their view the Legislature has given to the jury the sole authority, as well as the duty, to decide upon the punishment. Thus, even when a trial error is related to the matter of punishment alone, appellate courts are powerless to reduce a death sentence returned by a jury to life imprisonment.

For example in *People v. Green*, 47 *Cal. 2d* 209, 302 *P. 2d* 307, 314 (1956) the Supreme Court said:

"Construing section 190 this Court said in *People v. Bollinger* (1925) 196 Cal. 191, 207, 237 P. 25, 'Before the amendment of that section in 1873–74 (Stats. 1873–74, p. 457) it read as follows: "Every person guilty of murder in the first degree shall suffer death * * *." It is clear beyond question that by the language of the amended section—"Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury trying the same; * * *"— two changes were made in the law as to the punishment for murder in the first degree—first, that the punishment may be *either* death or life imprisonment; and second, that the discretion of determining which punishment shall be imposed was vested in the jury alone. For, as declared in * * * [Winston v. United States (1899), 172 U. S. 303, 19 S. Ct. 212, 43 L. Ed. 456], the law places no restriction upon the jury's exercise of such discretion, nor does it attempt to confine its exercise to cases presenting palliating or mitigating circumstances * * * The legislature has "confided the power to affix the punishment within these two alternatives to the absolute discretion of the jury. * * *"' "

This rule has existed in California since *People v. Leary*, 105 *Cal.* 486, 39 *P.* 24, 26 (1895). The court held:

"The law submits to the jury, under the instruction of the court, the question as to the degree of murder, if any, of which the defendant is guilty in any instance; and section 190 of the Penal Code further provides that one found guilty of murder in the first degree 'shall suffer death or confinement in the state prison for life, at the discretion of the jury.' Whatever may have been the actuating consideration in the minds of the legislature in enacting section 190,—whether because they believed there are instances of murder falling within the definition of murder in the first degree, which, because characterized by a less degree of atrocity or other mitigating circumstances, call for a milder punishment than that of death, or whether their reason was something else—the fact

remains that they have confided the power to affix the punishment within these two alternatives to the absolute discretion of the jury, *with no power reserved to the court to review their action in that respect.*" (Emphasis added.)

See also *People v. Moore,* 53 *Cal.* 2d 451, 2 *Cal. Rptr.* 6, 8, 348 *P.* 2d 584, 586, *certiorari* denied, 364 *U. S.* 895, 81 *S. Ct.* 226, 5 *L. Ed.* 2d 189 (1960). The California Supreme Court has said that it cannot substitute its judgment as to choice of punishment "even where we may doubt the appropriateness of the death penalty"; also that when there is trial error relating only to selection of the death penalty, it cannot correct the error by reducing the punishment, "but must reverse and remand the question to the trier of fact." *People v. Rittger,* 54 *Cal.* 2d 720, 7 *Cal. Rptr.* 901, 355 *P.* 2d 645, 653 (1960) ; *People v. Linden,* 52 *Cal.* 2d 1, 338 *P.* 2d 397, 410 (1959), *certiorari* denied, 364 *U. S.* 849, 81 *S. Ct.* 94, 5 *L. Ed.* 2d 73 (1960). See also *People v. Love,* 56 *Cal.* 2d 720, 16 *Cal. Rptr.* 777, 780, 366 *P.* 2d 33, 36 (1961) ; *People v. Borchers,* 50 *Cal.* 2d 321, 325 *P.* 2d 97, 102 (1958).

*Winston v. United States,* 172 *U. S.* 303, 19 *S. Ct.* 212, 43 *L. Ed.* 456 (1899), referred to in *People v. Green, supra,* dealt with the then existing federal statute which authorized the jury, in murder cases, to qualify its verdict of guilty by adding thereto, in its discretion, "without capital punishment." The United States Supreme Court declared that by that act of Congress the question whether the accused should be punished capitally was committed to the sound discretion of the jury "and of the jury alone." 172 *U. S.,* at *p.* 313, 19 *S. Ct.,* at *p.* 215, 43 *L. Ed.,* at *p.* 460. See also *Andres v. United States,* 333 *U. S.* 740, 763, 68 *S. Ct.* 880, 891, 92 *L. Ed.* 1055, 1068–1069 (1948) (Frankfurter, J. concurring). That view reechoed the earlier opinion of the first Justice Harlan in *Calton v. People of Territory of Utah,* 130 *U. S.* 83, 9 *S. Ct.* 435, 32 *L. Ed.* 870 (1889). There the jury returned a verdict of death. The trial

court had overlooked advising the jury that they could recommend life imprisonment, in which event the trial court in its discretion could impose such sentence. For that error, the United States Supreme Court reversed and ordered a new trial. In doing so Justice Harlan said:

"Without such recommendation the court, *in the absence of sufficient grounds for a new trial,* has no alternative but to sentence the accused to suffer death. While in this case the jury were instructed as to what constituted murder in the first and second degrees, they were not informed as to their right, under the statute, to recommend imprisonment for life at hard labor in the penitentiary in place of the punishment of death. If their attention had been called to that statute, it may be that they would have made such a recommendation, and thereby enabled the court to reduce the punishment to imprisonment for life. We are of the opinion that the court erred in not directing the attention of the jury to this matter." (Emphasis added.) 130 *U. S.* at *p.* 86, 9 *S. Ct.* at *p.* 436, 32 *L. Ed.* at *p.* 871.

In passing it might be recalled that the federal appellate courts generally continue to adhere to the doctrine of non-reviewability of criminal death sentences. *United States v. Rosenberg,* 195 *F. 2d* 583, 605–606 (*2d Cir.*), certiorari denied, 344 *U. S.* 838, 73 *S. Ct.* 20, 97 *L. Ed.* 687 (1952). The fact that such courts have a general statutory power to "affirm, modify * * * or reverse" judgments on appeal has not been regarded as justification for review of legal but allegedly excessive sentences. 28 *U. S. C.* § 2106; Appellate Review of Sentences, 32 *F. R. D.* 257 (1962).

Within the past few weeks the United States Supreme Court in *United States v. Jackson,* 390 *U. S.* 570, 88 *S. Ct.* 1209, 20 *L. Ed. 2d* 138 (1968), construed the death penalty provision of the Federal Kidnapping Act which contains language less stringent than *N. J. S.* 2*A*:113–4. The statute says:

"Whoever knowingly transports in interstate * * * commerce, any person who has been unlawfully * * * kidnapped * * * and held for ransom * * * or otherwise * * * *shall* be punished (1) by death if the kidnapped person has not been liberated unharmed,

and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed." 18 *U. S. C.* § 1201(a). (Emphasis added.)

The Government construed the language to mean that a defendant who elects to be tried by a jury cannot be put to death even if the jury so recommends—unless the trial judge concurs that capital punishment should be imposed. This contention was rejected. The Court said:

"At the outset we reject the Government's argument that the Federal Kidnapping Act gives the trial judge discretion to set aside a jury recommendation of death. So far as we are aware, not once in the entire 34-year history of the Act has a jury's recommendation of death been discarded by a trial judge. The Government would apparently have us assume either that trial judges have always agreed with jury recommendations of capital punishment under the statute—an unrealistic assumption at best—or that they have abdicated their statutory duty to exercise independent judgment on the issue of penalty. In fact, the explanation is a far simpler one. The statute unequivocally states that, 'if the verdict of the jury shall so recommend' the defendant 'shall be punished * * * by death * * *.' The word is 'shall,' not 'may.' In acceding without exception to jury recommendations of death, trial judges have simply carried out the mandate of the statute.

"The Government nonetheless urges that we overlook Congress' choice of the imperative. Whatever might have been assumed in the past, we are now asked to construe the statute so as to eliminate the jury's power to fix the death penalty without the approval of the presiding judge. 'This reading,' it is said, would conform 'to the long tradition that makes the trial judge in the federal courts the arbiter of the sentence.' And so it would. The difficulty is that Congress intentionally discarded that tradition when it passed the Federal Kidnapping Act. Over the forcefully articulated objection that jury sentencing would represent an unwarranted departure from settled federal practice, Congress rejected a version of the Kidnapping Act that would have left punishment to the court's discretion and instead chose an alternative that shifted from a single judge to a jury of 12 the onus of inflicting the penalty of death. To accept the Government's suggestion that the jury's sentencing role be treated as merely advisory would return to the judge the ultimate duty that Congress deliberately placed in other hands." 88 *S. Ct.* at *p.* 1213.

The plain implication of the quoted language is that the United States Supreme Court still follows the principle of

*Winston v. United States, supra, i. e.,* that Congress had committed to the jury and to the jury alone the decision as to whether the death penalty should be imposed.

The statutes of Pennsylvania, 18 P. S. § 4701, provide that whenever an accused is convicted of murder in the first degree he "shall be sentenced to suffer death * * * or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall in the manner * * * provided fix the penalty." In *Commonwealth v. Smith,* 405 *Pa.* 456, 176 *A.* 2d 619 (1962) the Supreme Court of that state said it had repeatedly pointed out that by reason of the statute a jury verdict of death could not be changed or reduced by the Supreme Court. In that case defendant urged the death penalty was an abuse of the jury's discretion in view of his mental defects and criminal record. In dealing with the contention the court quoted an earlier case, *Commonwealth v. Edwards,* 380 *Pa.* 52, 110 *A.* 2d 216, 217 (1955), to the following effect:

"Section 701 of The Penal Code of 1939, P. L. 872, 18 PS § 4701, vests in the jury the duty of fixing the penalty between death and life imprisonment upon a conviction of first degree murder. No discretion is allowed the trial court in sentencing for first degree murder where the penalty has been fixed by the jury. Nor has this court, upon the review of a judgment of sentence for first degree murder, which was imposed in accordance with the jury's verdict, any legal warrant to reduce the penalty so fixed: * * * For this court to assume to act otherwise would unconstitutionally trench upon the province of the Board of Pardons which functions as an agency of another coordinate branch of our State government.

In Commonwealth v. Neill, supra [362 Pa. 507, 67 A. 2d 276], where a conviction of first degree murder with penalty of death was affirmed, * * * the court aptly concluded [its] opinion with the succinct statement that 'The jury * * * imposed a penalty of death and, since it is they in whom the statute * * * vests discretion to fix the penalty, *it is not for this court to review their decision.'* * * * Or, as stated elsewhere by [this Court],—'Whether the jury exercised a wise discretion in fixing the penalty at death is not a matter for this court to determine.' Commonwealth v. Simmons, 361 Pa. 391, 405, 65 A. 2d 353, 360. *The lack of power in a court to change the penalty as specified by the jury for a conviction of first degree murder has been scrupulously regarded by this court*

ever since the duty of fixing the penalty in capital cases was first reposed in the jury by the Act of May 14, 1925, P. L. 759. Since that date, there has not been a single instance where the penalty for a first degree murder, as fixed by the jury, has been interfered with on appeal—a fact which we have heretofore remarked several times." (Citations omitted, emphasis added.)

The majority opinion in the present case suggests that the Pennsylvania Supreme Court has departed from the rule of *Commonwealth v. Smith.* It refers to *Commonwealth v. Aljoe,* 420 *Pa.* 198, 216 *A.* 2d 50, 16 *A. L. R.* 3d 1126 (1966) where the court remanded the case to the trial court with directions to vacate the death penalty and to sentence Aljoe to life imprisonment.

Under the Pennsylvania statute, 18 *P. S.* § 4701, the issues of guilt and punishment are determined in separate trials (a procedure which I believe we can and should adopt). The Act provides also that if the jurors fail to agree upon the penalty, the trial judge may discharge them and if no retrial of the indictment is ordered, he "shall sentence the defendant to life imprisonment" upon the already recorded jury verdict of guilt of first degree murder. In *Aljoe,* during trial of the punishment aspect of the case the prosecutor made unfair and prejudicial remarks to the jury about parole. The Supreme Court, on appeal from the death sentence, reversed and said there was no need for a new trial on punishment. The case was then treated as if the prosecutor's conduct had produced a mistrial, *i. e.,* the record was considered to have produced the same result that a jury disagreement would achieve. On that basis the Court used the express statutory authority to direct the trial court to change the death penalty to life imprisonment. The court's logic is rather strained, but in reaching the result it did not intend to impair the holding of *Commonwealth v. Smith.* It said *Smith* was "clearly distinguishable."

The majority opinion cites two additional Pennsylvania cases, *Commonwealth v. Green,* 396 *Pa.* 137, 151 *A.* 2d 241 (1959) and *Commonwealth v. Garramone,* 307 *Pa.* 507, 161

*A. 733,* 89 *A. L. R.* 291 (1932). In each of them the defendant pleaded guilty to murder. In that situation (which could not arise in New Jersey), by statute the trial court proceeds to hear evidence to decide upon the punishment, which may be either death or life imprisonment. The Supreme Court held that imposition of the death penalty in such a statutory proceeding is reviewable on appeal, and if too severe in light of the evidence it may be reduced to life imprisonment. In *Commonwealth v. Green* there was a strong dissent by the author of *Commonwealth v. Smith, supra.* In this connection also, it should be noted that in California, where the trial court is given express statutory discretionary authority to modify a death penalty stemming from a jury verdict, the rule is that only the trial court may do so. Its decision is not reviewable by an appellate tribunal. *People v. Linden, supra,* 338 *P. 2d,* at *p.* 410; *People v. Rittger, supra,* 7 Cal. Rptr., at *p.* 909, 355 *P. 2d,* at *p.* 653.

Iowa's statute respecting punishment is similar to that of New Jersey. It requires the jury to direct whether the punishment shall be death or life imprisonment. The Iowa Supreme Court has held that the statute leaves it solely to the jury to elect between the two permissible punishments for a finding of first degree murder. Therefore the court cannot reduce a death penalty fixed by the jury. *State v. Brown,* 253 *Iowa* 658, 113 *N. W. 2d* 286 (1962).

An earlier Iowa case, *State v. O'Donnell,* 176 *Iowa* 337, 157 *N. W.* 870 (1916), considered the problem at length. The jury found defendant guilty of first degree murder and assessed the death penalty. The Supreme Court on appeal found the evidence inadequate to support a first degree conviction because of insufficient proof of premeditation. Consequently it reversed the judgment and ordered a new trial. It was argued that instead of ordering a new trial, since the evidence supported a finding of murder in the second degree, the court should reduce the sentence to life imprisonment, the maximum sentence for second degree murder. The Supreme Court refused, saying:

"It is manifest, then, that as the election between two statutory punishments is left solely to the jury, any change in such punishment this court makes changes that election and deals with an act wholly that of the jury. * * * It is the jury, not the court, that imposed this punishment. It has no power to change that punishment; has nothing but the merely formal power to formulate into a sentence what the jury has predetermined upon exclusive grant from the Legislature. * * *

Having once determined that a jury has failed of its duty, then to fix the punishment by determining what the evidence establishes is an attempt to turn this court into a substitute jury, no matter in what guise we proceed." 157 *N. W.* at *pp.* 874–875.

See, to the same effect, *White v. Rhay,* 64 *Wash.* 2d 15, 390 *P.* 2d 535 (1964); *State v. White,* 60 *Wash.* 2d 551, 374 *P.* 2d 942, 955 (1962); *State v. Odom,* 200 *Tenn.* 231, 292 *S. W.* 2d 23 (1956); *Williams v. State,* 191 *Tenn.* 456, 234 *S. W.* 2d 993 (1950); *Batts v. State,* 189 *Tenn.* 30, 222 *S. W.* 2d 190 (1946); *Mays v. State,* 143 *Tenn.* 443, 226 *S.W.* 233 (1920).

In *Williams v. State* the defendant was tried for murder. During deliberations the jury asked the court whether, "if we give this man a sentence for a term of years," will it mean that "he will have to stay in prison the whole time?" The court answered: "Not necessarily. It would depend upon the good behavior of the defendant and the attitude of the Parole Board under the indeterminate sentence law, but that is something with which you have nothing to do." After less than five minutes of further deliberation, the jury returned with the death penalty. On appeal the Supreme Court reversed and ordered a new trial, holding that it was error for the trial judge to enter into a discussion with the jury as to the effect of certain punishment. Among other things it said: "Evidently the jury in the instant case would have sentenced the defendant to some term in the penitentiary had they believed that he would have to serve the full term of the sentence." No suggestion was made that the appellate tribunal could reduce the punishment rather than order a new trial.

My colleagues cite also *State v. Goodyear*, 98 *Ariz.* 304, 404 *P.* 2d 397 (1965), reversed on other grounds, 100 *Ariz.* 244, 413 *P.* 2d 566 (1966) ; *Hubka v. State*, 40 *Okl. Cr.* 161, 267 *P.* 864 (1928) ; *Davis v. State*, 155 *Ark.* 245, 244 *S. W.* 750 (1922) and *State v. Ramirez*, 34 *Idaho* 623, 203 *P.* 279 (1921) in support of their position. In *Davis v. State*, a 3-2 court declared that under the circumstances revealed by the evidence, the death sentence for the rape committed was too severe because the "circumstances all tend to show that the prosecuting witness was not entirely the innocent victim of brute force." Consequently the sentence was reduced to life imprisonment. The dissenting judges said the power to impose life imprisonment rather than a death sentence was conferred by the statute solely on the jury. In their view, when the jury fixed the punishment at death and the evidence was sufficient to sustain the finding of guilt, the Supreme Court had no authority to reduce the punishment.

But more to the point, later cases seem to have emptied *Davis* of real value as a precedent. In *Allison v. State*, 204 *Ark.* 609, 164 *S. W.* 2d 442 (1942) the Supreme Court refused to substitute life imprisonment for a death sentence "although in Davis * * * the holding was otherwise," saying, "it will be observed that the discretion conferred by * * * [the Act] relates to the jury, and not to the courts." 164 *S. W.* 2d, at 446. Further, in *Nail v. State*, 231 *Ark.* 70, 328 *S. W.* 2d 836 (1959), a murder case wherein the jury set the death penalty, on appeal defendant urged that the sentence was excessive and should be lowered to life imprisonment. The same court cited *Allison* and said: "[T]he matter of assessing punishment is strictly within the province of the jury, and we have no power to change the fixed punishment unless the proof fails to sustain the charge for which the defendant is convicted." 328 *S. W.* 2d, at p. 845.

With respect to *State v. Goodyear*, it should not be overlooked that the Arizona statute, *A. R. S.* § 13-1717, sub-

section B, specifically provides that on appeal from a sentence on the ground that it is excessive "the court shall have the power to reduce the extent or duration of the punishment imposed, if, in its opinion the conviction is proper, but the punishment imposed is greater than under the circumstances of the case ought to be inflicted. In such case the supreme court shall impose any legal sentence, not more severe than that originally imposed, which in its opinion is proper."

In *State v. Ramirez,* a divided Idaho Supreme Court construed its broad statute governing appellate review as sufficient to confer authority to modify a death sentence by changing it to life imprisonment when the trial error was not sufficiently prejudicial to warrant a reversal and a new trial, and where the evidence relating to the crime and the type and character of the defendant was such as to convince the court that the extreme penalty was "not warranted" and therefore represented excessive punishment. This type of procedure, which seems to have been followed in Oklahoma as well, has been subjected to substantial criticism. See *infra.*

In *Hubka v. State,* a jury convicted defendant of murder and fixed his punishment at death. There was no prejudicial trial error in the record. Substantial but conflicting evidence of defendant's sanity had been introduced. It was shown that the deceased had threatened to kill or injure the defendant. It was also shown that there was considerable animosity between defendant and decedent over the purchase of a farm owned by defendant's mother. The Criminal Court of Appeals held that it had the power to review legal but excessive sentences. After reviewing all the circumstances relating to this homicide, it found the punishment of death to be excessive, and ordered a reduction to life imprisonment. The A. B. A. Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences (Tent. Draft, April 1967) points out that in Oklahoma the Court of Criminal Appeals uses "the review power in effect to compensate the defendant for errors that were committed

at trial but that do not rise to the level of grounds for reversal." The report comments that "the practice is * * * specifically disapproved." *pp.* 49–50.

The A. B. A. report just cited is referred to by my colleagues of the majority on three occasions as a source of support for their views. At one point the opinion refers to a suggestion that sentencing in each case by a different jury contributes significantly to unfounded disparity between sentences. Then it quotes from page 17 of the A. B. A. report that this is "all the more reason for judicial review in those cases where the jury participates in the sentencing." The opinion fails to note, however, that the report expressly says it "does not deal with whether the death penalty should be an available sentencing alternative and if so, who should participate in its imposition." *pp.* 13, 43. Later the report points out "Both the Model Sentencing Act (§ 12) and the Model Penal Code (Articles 6 and 7) clearly deny to the jury a role in sentencing, again with the exception of capital cases." *p.* 45.

It is important to note that in the four cited cases the appellate courts, in asserting power of review, reduced the death penalty to life imprisonment because upon a consideration of all the evidence they found sufficient mitigating circumstances to induce the conclusion that the extreme penalty was too severe. Undoubtedly if a legal error of the nature involved in the present case appeared in those cases, a new trial would have been ordered. See *Calton v. People of Territory of Utah, supra,* 130 *U. S.,* at *p.* 86, 9 *S. Ct.,* at *p.* 436, 32 *L. Ed.,* at *p.* 871. Moreover, in those cases the test applied by the appellate courts was whether, on the evidence, the death penalty constituted excessive punishment. In our case no member of the majority says that after a review of all the evidence, he finds the death penalty excessive. As I have already said, even if our Court had authority to reduce the sentence here, which I dispute, the action of the majority is violative of the single standard for determining whether the sentence should be death or

life imprisonment, *i. e.*, it must be done "upon and after a consideration of all the evidence." Otherwise, for an error of law such as occurred in the charge of the trial judge here, appellate court remedy must be a new trial.

The majority opinion puts considerable emphasis on the recent case of *Spillers v. State, Nev.*, 436 *P. 2d* 18 (1968). That too was a 3-2 opinion of the Supreme Court with a strong dissent. The prevailing opinion declared unconstitutional the penalty scheme set out in the statute. Defendant was convicted of rape by a jury which fixed the penalty at death. The statute in question provided that on a plea of not guilty the defendant could be tried by a jury or by the court, if he waived jury trial with the consent of the State and approval of the court. If tried by the court alone and convicted, the punishment was limited to imprisonment for not less than 20 years. The death penalty could not be imposed. But if tried by a jury, that body was empowered to impose the death penalty. We need not discuss the portion of the statute condemned as unconstitutional. Accepting the declaration of invalidity, for our purposes it means that imposition of the death sentence was illegal because the statute authorized two different penalties for the same crime. The remedy applied by the court was to regard the authorized punishment as the same whether the trial of the issue of guilt was with or without a jury. Consequently, guilt being plain, the court changed the sentence to the maximum open to the trial court, "imprisonment for a term of not less than 20 years which may extend to life." The lack of analogy to our case is obvious. In effect, the Supreme Court simply struck from the statute the unconstitutional clause "or he shall suffer death, if the jury by their verdict affix the death penalty."

There remains for consideration the three District of Columbia cases heavily stressed by the majority opinion. The first is *Frady v. United States*, 121 *U. S. App. D. C.* 78, 348 *F. 2d* 84 (*D. C. Cir.*), *certiorari* denied 382 *U. S.* 909, 86 *S. Ct.* 247, 15 *L. Ed. 2d* 160 (1965). In this case a

jury convicted the defendant of first degree murder and fixed the punishment at death. A majority of the nine-judge court affirmed the guilt part of the judgment but found error in the charge of the court which inferentially advised the jury that the verdict with respect to punishment had to be unanimous. This was said to be incorrect because lack of unanimity as to punishment "is altogether in order" under the statute, 22 *D. C. Code* § 2404 (Supp. IV, 1965). The statute provides that if the jury cannot agree as to punishment the court shall have jurisdiction to impose either a sentence of death or life imprisonment. The majority found further error in the manner in which the jury was polled upon return of their verdict.

Eight of the judges were troubled as to what course to pursue with respect to the sentence. One judge voted to reverse because of insufficient proof of first degree murder. This resulted in five separate opinions as well as a one paragraph *per curiam* which dictated the result, *i. e.*, a change of the death sentence to life imprisonment. There was no majority opinion. Four judges joined in an opinion which found authority in 28 *U. S. C.* § 2106 to "modify" the sentence; a fifth judge went along because the government had indicated that entry of a judgment of life imprisonment would be "a proper course." But this fifth judge, in a comprehensive opinion, proclaimed his view that in capital cases "the cause of enlightened and efficient criminal administration is best served by a two-stage trial. In the first stage, the inquiry is focused upon the issue of whether the defendant is guilty as charged. In the second, the jury takes up the matter of the penalty to be exacted." He went on to say:

"It is obvious that evidence relevant to the one may well be unrelated to the other. It is equally obvious that inability to adduce evidence as to both can operate to the prejudice of both the defendant and the public in the elucidation of those considerations entering most directly into any assessment of punishment which seriously purports to have been arrived at by rational means." 348 *F. 2d* at *p.* 91.

Of the four judges who found the necessary authority in 28 *U. S. C.* § 2106, two concurred in the view that the bifurcated trial was a desirable procedure, and two reserved their positions on bifurcation. The four remaining judges dissented from the order changing the death sentence to life imprisonment, saying there was no justification in statute or case law for such action. Their opinion pointed out that under the statute, upon a finding of first degree murder, the penalty must be death unless the jury unanimously recommends life imprisonment. Therefore, it said that since the jury made no such recommendation and did not report a disagreement as to punishment, the death sentence was required by the statute; "it must follow a verdict of guilty unless the jury affirmatively acts in the manner detailed in the statute." 348 *F. 2d,* at *p.* 113. These four judges agreed that in the absence of Congressional authorization the federal courts have no power to adopt the two-stage trial practice.[1] The disparate views of these conscientious judges furnish very little in the way of substantial support for the majority opinion in our case.

In *Coleman v. United States,* 123 *U. S. App. D. C.* 103, 357 *F. 2d* 563 (*D. C. Cir.* 1965) defendant had been convicted of murder in the first degree and sentenced to death under the mandatory statute then in force. The conviction was affirmed 5-4 in the Court of Appeals, 295 *F. 2d* 555, and *certiorari* denied by the United States Supreme Court, 369 *U. S.* 813, 82 *S. Ct.* 689, 7 *L. Ed.* 2d 615. While the appeal was pending Congress abolished the mandatory death penalty and left the issue of death or life imprisonment to the judgment of the jury. The statute provided that as to cases already before the court for sentence or resentence "the judge may, in his sole discretion, consider circumstances in mitigation and in aggravation and make a determination as to whether the case in his opinion justifies a sentence of

---

[1] At this juncture it is appropriate to say only that unlike our Court, the federal courts do not possess the sole power under the Constitution to deal with matters of practice and procedure.

life imprisonment, in which event he shall sentence the defendant to life imprisonment. * * *" 22 *D. C. Code* § 2404.

Shortly after passage of this Act, defendant unsuccessfully sought relief under it from the trial judge. On appeal the cause was remanded to the trial judge with directions to conduct an evidentiary hearing to aid him in consideration "of circumstances in mitigation and in aggravation." A different trial judge held such a hearing and refused to reduce the death penalty. On the third review, which is the cited case, the Court of Appeals found procedural error in the trial judge's handling of the hearing and by a 6-3 vote, rather than remand again for hearing before another judge, it directed that the death sentence he reduced to life imprisonment. Plainly the abolition of the mandatory death sentence by Congress was in large measure responsible for this unusual result. The majority said:

"When we sustained the designation of a judge other than the trial judge to consider the sentence we went as far as we should go in upholding a sentencing process lacking the participation of the judge who presided at the trial. To go further *in this sole remaining case of resentencing due to abolition of the mandatory death sentence*, and direct the designation of still another judge, finds no solid support in any applicable law, Rule or reason." (Emphasis added.) 357 *F.* 2d at *p.* 572.

The majority continued:

"We may add, though this is unnecessary to our decision, that no one recommends capital punishment in this case. The United States refrains from doing so. The Probation Officer recommends against it. The two Chaplains, one Protestant, one Catholic, recommend against it. The testimony indicates that during these past years appellant has not only been penitent and remorseful, but has become a most likely subject for rehabilitation and influence for good in the prison." 357 *F.* 2d at *p.* 573.

This *ad hoc* decision was subjected to a strong dissent which referred to the long-standing federal rule that appellate courts have no authority to modify a death sentence and impose one of life imprisonment. The dissent said:

"The question of whether the death penalty is a proper punishment for crime is peculiarly one of legislative policy. Once the Congress has decided to provide for capital punishment, federal appellate courts lack the power to review any sentence, including a death sentence validly imposed. * * *

Assuming, however, * * * that we could legitimately find that the trial judge erred in failing to consider certain circumstances in this case as mitigating, the law is equally as clear that this court lacks the authority to modify the death sentence and itself impose a sentence of life imprisonment." 357 *F. 2d* at *p.* 574.

The dissenters referred to *Gore v. United States,* 357 *U. S.* 386, 393, 78 *S. Ct.* 1280, 2 *L. Ed. 2d* 1405 (1958), wherein the United States Supreme Court declared that as an appellate court it had no power to increase or reduce a sentence, even a death sentence. See 357 *F. 2d,* at *p.* 576, *n.* 3. They declared also that when there was trial error affecting the matter of sentence, the appellate remedy was limited to ordering a new trial or remanding for resentence. 357 *F. 2d,* at *p.* 575.

The third case cited by the majority here is *Austin v. United States,* 382 *F. 2d* 129 (*D. C. Cir.* 1967). In that case the jury found first degree murder and fixed the sentence at life imprisonment. There was no doubt about commission of the homicide by defendant; the essence of his defense was insanity. On appeal a divided court adjudged the evidence insufficient to support a first degree murder conviction, but ample for a second degree verdict. The majority said that since the first degree verdict was illegal and second degree murder had been shown beyond a reasonable doubt by the government, and a finding of second degree murder was necessarily incorporated in the jury verdict, the case should be remanded for the entry of a judgment of second degree murder, unless the trial court "determines that a new trial is in the interest of justice." It should not escape attention that the majority of the court made plain in a separate opinion that they were dealing with a verdict the proof would not support. They said:

"No one should equate our action in this case with an intention to take a step in the direction of holding that we have the power of review of sentences imposed by the District Court. As Judge Leventhal points out, appellate courts 'have no power to alter a lawful sentence in the absence of express authority.'" 382 *F. 2d* at *p.* 143.

In a footnote, the majority added by way of explanation of *Coleman* and *Frady, supra*:

"This principle [lack of power to reduce a sentence in the absence of explicit statutory authority] was not disavowed by this court's en banc opinions in Coleman v. United States * * * and Frady v. United States * * *, where Section 2106 was invoked because of an error in the sentencing process which could not be remedied on a remand." 382 *F. 2d* at *p.* 141, *n.* 25.

As has been shown above, the action of the Court of Appeals in *Austin* is contrary to *State v. O'Donnell, supra,* 176 *Iowa* 337, 157 *N. W.* 871 (1916) and to *State v. Butler, supra,* 27 *N. J.* 560, 597–598 (1958).

The review of the cases in the various jurisdictions both against and, according to the majority opinion, in favor of the view that this Court has power to reduce defendants' sentences to life imprisonment, has left me with the abiding conviction that we have no such authority. The study and comparison is not wholly rewarding, however, because in the last analysis the result must be dictated by the clear language of our own statute. That language, viewed particularly in the light of its evolution, gives exclusive authority to the jury to decide between a life and death sentence, when the evidence supports a verdict of first degree murder. My conclusions in that regard lead me to quote from the dissent in *Coleman v. United States, supra*:

"I fear the majority is acting only from expediency and with grave shortsightedness in seizing * * * [Revised Rules 1:5–1(*c*) and 1:9–1] as a basis for supervising * * * [this sentence]. The exceptions which will be developed by such a subjective standard can only depend on the likes, dislikes, prejudices and sympathies of judges who, however well-intentioned, are in fact substituting

a personal philosophy of what is best for our civilization as a replacement for * * * [*N. J. S.* 2A:113–4] and other existing laws. This unfortunately but necessarily results in a rule of men, unsupported either by statute or other legal authority." 357 *F.* 2*d* at *p.* 579.

The error of the majority is more serious than this excerpt describes. At least in *Frady, Coleman* and *Austin* the Federal Court of Appeals found the evidence insufficient to support the sentence imposed. It is perfectly obvious that the evidence supports the jury verdict and sentence in our case, and there is not the slightest suggestion to the contrary. Aside from the fact that the defendants oppose the action of the majority, the reduction of the sentence unfairly deprives the public of its statutory right to a jury trial on the issue of punishment. The Legislature gave the public that right; this Court cannot and should not take it away.

My colleagues' opinion suggests that if "we are to keep faith" with the delegates who drafted the 1947 Constitution "and to match their vision," our power to transform this death sentence to life imprisonment should not be found wanting. Certainly if those competent men envisioned a need for or the desirability of authority, which had never been recognized or exercised in the history of our State, they would have established the authority by express language. I am unwilling to assume that even on a clear day the delegates could see forever. What they saw then, and clearly, was the need for perpetuation of our tripartite form of democratic government and the independence of each of its parts. I do not find in the language of the document they fathered any sign of an intention to permit the judicial branch of the government to nullify valid enactments of the legislative branch.

## II

Since this Court has no authority to reduce the death sentence here, what course should the appeal take? The conventional course, and the one previously followed in our

State, obviously is reversal for the error in the trial court's charge and remand for a new trial on all issues. Such was the order in *State v. White, supra*, 27 *N. J.* 158 (1958).

At the oral argument the Prosecutor indicated he could not locate one important out-of-state witness who testified at the first trial. Primarily because of the Prosecutor's situation with this one witness, he felt he was not in a position to take a new trial on all issues, *i. e.,* guilt and punishment. But so much attention was focused upon the question whether this Court could reduce the death sentence to life imprisonment that no mention was made of the rule which would permit the reading of the testimony of any unavailable witness to the jury at a new trial. It has long been settled that on retrial of a criminal case, if either a State or defense witness who testified at the original trial has since died or become unavailable, an official transcript of his testimony on direct and cross-examination may be read to the jury. The principle was incorporated in Rule 63(3) of the Rules of Evidence recently adopted both by this Court and by the Legislature. L. 1967, Joint Resolution No. 5. See also § 1290, Former testimony, California Evidence Code, approved L. 1965, c. 299; *Pointer v. State of Texas,* 380 *U. S.* 400, 85 *S. Ct.* 1065, 13 *L. Ed. 2d* 923 (1965); *Douglas v. State of Alabama,* 380 *U. S.* 415, 85 *S. Ct.* 1074, 13 *L. Ed. 2d* 934 (1965); *State v. Hogan,* 132 *N. J. L.* 148 *(Sup. Ct.* 1944); 5 *Wigmore, Evidence* § 1398 (3d ed. 1940); Annotation, 11 *A. L. R. 2d* 30, 58. See also *Barber v. Page,* 390 *U. S.* 719, 88 *S. Ct.* 1318, 20 *L. Ed. 2d* 255 (1968). Since the right of the State to have the testimony of the missing witness read at a retrial was overlooked in the briefs of the parties and on the oral argument, quite obviously the so-called waiver of the death penalty by the Prosecutor during the argument takes on a different complexion. The practical obstacle he referred to as being in the way of a new trial on all issues does not exist. The majority opinion, referring to the suggestion to be discussed hereafter that the matter be remanded for a retrial limited to punishment

alone, says: "The suggestion that a new jury could fairly be called upon to read the many thousands of pages of testimony at the former trial, in lieu of hearing live witnesses, would appear to be too unrealistic to require discussion." The record contains no such suggestion. The suggestion is that the testimony of the single missing witness be read to the jury, whatever the nature of the proceeding on remand. Such a burden, in the interest of achieving justice for the State as well as the defendants, is not a heavy one.

This brings me to what I cannot refrain from calling the "so-called" death penalty waiver made by the Prosecutor during the oral argument. The majority opinion fails to set forth the full situation. The Prosecutor said that prior to the trial of the case he consulted his conscience and concluded, because of the heinous nature of this murder, that his public duty required him to seek the death penalty. His opinion as to this duty was the same when the appeal was argued. On becoming aware of this Court's view that the trial court had committed error in responding to the inquiry of the jury as to whether "a jury can render a verdict of life imprisonment without possibility of parole and make it binding," the Prosecutor feared that he could not retry the case as to both guilt and punishment if he could not produce the important missing witness. For that reason, he requested that a retrial, if ordered, be limited to the issue of punishment alone. It is plain from the briefs and the oral argument that in making the limited retrial suggestion he gave no consideration to the State's right to read the witness's testimony at a retrial whether ordered on all issues or on punishment alone. Consequently, when pressed by the Court to assume that he could not have a retrial as to punishment alone, and to say on that assumption whether his choice would be a reversal of the judgment and a new trial on all issues or acceptance of an order by the court reducing the death sentences to life imprisonment, he reluctantly said he preferred the downgrading of the penalties.

The questions from the Court were put to the Prosecutor in terms of his waiving the death penalty. His answers were, "it is my position that I have no power under the law to waive, * * * I have a very strong conviction that I do not have the power. It is a jury power. * * * [O]nly for the purpose of expediency * * * [apparently because of the absence of the witness] I would say I would make a deal. I will take half a loaf, better than none. * * * My wish, as stated in the brief, is that the case go back on a bifurcated basis." Pressed again to assume it would not go back on that basis, he said "if the Court please, I want to call it expediency, because I feel strongly the other way. I would say I will take life imprisonment. I have to say that." On being asked by Justice Schettino:

"Assuming the same witnesses who were available for the first trial are still available for the retrial, would you say you would be satisfied with life imprisonment instead of the death penalty?"

Mr. Callissi responded

"No sir, I would not."

If a waiver is a voluntary relinquishment of a known right, the Prosecutor's language scarcely fits the description. But, as indicated earlier, it seems clear that the majority would have reached the same result without his grudging concession.

Two factors are beyond dispute. First, the Prosecutor contended that this Court has no power to change a death sentence to life imprisonment; that such authority has been committed by the Legislature to the jury. Second, he insisted a prosecutor has no authority to make a waiver of the death penalty before or during trial which would be binding on the jury, or on an appellate court after a verdict for the death penalty had been returned. My agreement that this Court trespasses on the legislative domain when it undertakes to reduce the sentence has already been expressed. As

to the second claim, after deep consideration of the problem I have become convinced that by reason of the statute, *N. J. S.* 2*A*:113–4, a prosecutor cannot waive the death penalty and make the waiver binding on the jury when, at the trial of a murder indictment, he seeks a conviction for first degree murder. The statute says that on a finding by a jury of first degree murder the punishment shall be death unless *the jury* recommends life imprisonment after a consideration of all the evidence. The Legislature has not vested the prosecutor with authority to say to the jury that he waives the death penalty, and therefore the jury *cannot* return such penalty. There is nothing anywhere in the statutes which even suggests that the prosecutor can take away from the jury the power conferred on it alone by the lawmakers.

The prosecutor has much discretion in administering the criminal law. Undoubtedly he could seek a second degree murder indictment from the Grand Jury if in his judgment the facts warranted no greater charge. If the Grand Jury returned such an indictment, at trial the death penalty would not be in the case. Further, on the trial of a first degree murder case, a prosecutor can in his discretion tell the jury and the court that the State is not seeking the death penalty. In such situations it is unlikely that a jury would return a verdict carrying the death penalty. Ordinarily, the court in its charge would speak favorably of the prosecutor's decision not to ask for the punishment of death. But neither the prosecutor nor the court could, in the face of the statutory mandate, take away from the jury its right and duty to decide on life or death for the accused.

Regardless of the *quantum* of discretion the prosecutor possesses in administering the criminal law, the discretion must be exercised within the limits of the authority conferred and the duties imposed upon him by statute. *N. J. S.* 2*A*:158-5. Apparently in support of the view that a prosecutor has authority to bind the jury by his decision not to seek the death penalty in a first degree murder case, the majority refer to the prosecutor's authority to seek only a second

degree murder indictment from the Grand Jury (a practice *in proper cases* which I have long advocated. See *State v. Sullivan, supra,* 43 *N. J.,* at *p.* 246). They refer also to his authority to seek and obtain from the trial court a dismissal or *nolle pros.* of a first degree murder indictment. Reliance on such discretionary authority is most surprising. Obviously a prosecutor's authority to seek a second degree murder indictment does not empower him to do so in a case which he knows on the facts warrants a first degree indictment; nor would such authority empower him to obtain a *nolle pros.* of a first degree murder indictment if he knows he can proceed to trial with witnesses and evidence clearly showing first degree murder. Such willful failure to discharge his statutory duty to use "all reasonable and lawful diligence * * * for the indictment and conviction of offenders against the laws" would constitute misconduct in office. *State v. Winne,* 12 *N. J.* 152 (1953). Nor is the situation changed by the undeniable fact that a prosecutor may decide properly not to seek the death penalty on a first degree murder indictment and that as a practical matter the jury in all likelihood in the great majority of cases will go along with the prosecutor's view that the extreme penalty is not warranted. The prosecutor's authority can rise no higher than the criminal statute he is enforcing. Arrogation of power to himself in excess of that statute, even if frequently engaged in, would never justify its exercise. The wisdom of the statute giving control of the death penalty to the jury in first degree cases is not open to consideration by this Court. That question rests in legislative hands.

In 1955 in *State v. Pontery,* 19 *N. J.* 457, the prosecutor told the jury the State was not asking for the death penalty. As a result, the trial court in its charge to the jury said that if a verdict of first degree murder was returned it had to be with a recommendation of life imprisonment. This Court declared that charge to be erroneous. It said, "the [trial] court could properly have charged the jury that under these present circumstances it would assume, as did the

prosecutor, that the death penalty would not be returned as it was not asked for, but the jury could not be stripped of its right to do so given by the Legislature." 19 *N. J.*, at *p.* 468. In 1965 this Court issued an administrative directive on the subject, entitled *In Re Waiver of Death Penalty*, 45 *N. J.* 501 (1965), to all Superior and County Court judges. It was felt that practical difficulties in drawing a jury when the prosecutor was not seeking the death penalty warranted the memorandum. By it, the trial courts were directed in such cases to instruct the jury that a verdict of murder in the first degree must be accompanied by a recommendation of life imprisonment.

I joined in that directive. But the more exhaustive study of the problem made in this case convinces me that we were wrong and that the directive was an encroachment on the independent power of the Legislature. Under the circumstances, in my judgment it should be withdrawn and the rule of *State v. Pontery* revived. A sound view on the subject was expressed by the Washington Supreme Court in *White v. Rhay, supra*, 390 *P. 2d*, at *p.* 540:

> "Petitioner is mistaken when he assumes that infliction of the death penalty in trials involving capital cases is in any way discretionary with the prosecuting attorney, or his deputies, conducting the trial for the state. Such discretion vests neither in counsel nor the court, but solely in the jury. The jury and the jury alone makes this finding."

In this connection, the majority opinion notes that since the filing of the earlier opinion in this case (50 *N. J.* 159) a new practice rule has been adopted by our Court which "very broadly provides" that "the prosecutor with the approval of the court may waive the death penalty." *R. R.* 3:1–3A. If the words "very broadly" are intended to signify that the purpose of the rule was to invest this Court with appellate power over a death sentence which did not exist previously, or to authorize the prosecutor on appeal to waive a death penalty which he sought and obtained from the jury, I deny it. No

one knows better than my colleagues that the reference to "the approval of the court" in the rule related to the trial court. Moreover, if, as I now firmly believe, neither the prosecutor nor the court has any authority to make a jury-binding waiver of the death penalty, the rule can have only this significance: Hereafter, when the prosecutor decides, prior to or during trial of a first degree murder case, that he will not *ask* for the death penalty, it will be necessary for him to obtain the consent of the trial court before he informs the jury of his non-binding view that the nature of the murder was such that he does not feel obliged to seek the death penalty.

All of the foregoing produces two inescapable conclusions. The Prosecutor is correct in his claim that our Court has no authority to reduce the death sentences to life imprisonment. He is on sound ground also in contending that he cannot make a waiver of the death penalty, before or during the trial of a first degree murder case, which would be binding on the jury or the court. Under the circumstances the majority opinion cannot draw any support for its vacation of the death sentences from the so-called waiver by the Prosecutor.

### III

The Prosecutor argues that the Court should adopt the bifurcated trial procedure in the trial of murder cases in our State. This practice simply means that in such cases, the trial would proceed in two stages. In the first stage, the jury would consider and decide the issue of guilt or innocence. If a verdict of murder in the first degree is returned, the trial would then move into the second stage, *i. e.,* determination by the jury of punishment—death or life imprisonment.

In the ordinary criminal case when the accused pleads guilty or is found guilty by a trial judge or after jury trial, no sentence is imposed until a presentence report is prepared by experienced probation officers and submitted to the sen-

tencing judge. *R. R.* 3:7–10(b). Such a report is mandatory. *State v. Culver, supra,* 23 *N. J.* 495. It is a biography of the defendant, ranging over his family life, education, mental capacity, employment activities, religious experience, community reputation, previous criminal record, if any, etc. Such reports are of immeasurable aid to trial judges in fitting the punishment to the offender as well as to the crime. *State v. White, supra,* 27 *N. J.,* at *pp.* 183–184 (concurring opinion). Yet in the most serious of all criminal trials, the homicide cases, until recently when a jury of inexperienced laymen decided that the accused was guilty of murder in the first degree, they were required to decide whether he should die or be sentenced to life imprisonment solely on the basis of the evidence relating to commission of the crime.

In *State v. Mount, supra,* this Court decided that within reasonable limits, evidence of an accused's general background, family life, education, mental and physical condition and the like, should be admitted at the trial of first degree murder cases, as an aid to the jury in deciding the matter of punishment if a finding of guilt is made. *Mount* was a step in the right direction. But in practice it has limited efficacy. Trials of murder cases have always been unitary affairs, *i. e.,* the issues of guilt and punishment are disposed of in one proceeding. Thus a defendant who asserts he is innocent of the killing frequently finds it impracticable and psychologically unwise to take advantage of the *Mount* doctrine. It is understandably difficult for an accused to assert his innocence and seek an acquittal, and at the same time offer background evidence for the purpose of asking clemency from the jury if his claim of innocence is disbelieved. Obviously there is much evidence which would be relevant as to sentence and not only irrelevant on the issue of guilt or innocence, but actually prejudicial to the defendant on that issue. And we know from our own experience since *Mount* that defendants have not availed themselves of its humane purpose because they fear an adverse jury reaction on the basic problem of guilt. We know

also that when an accused who denies guilt offers background evidence of previous antisocial behavior, in a unitary trial he runs a serious risk of prejudice on the guilt aspect of the case. See *State v. Reynolds*, 41 *N. J.* 163, 177–178 (1963), *certiorari* denied, 377 *U. S.* 1000, 84 *S. Ct.* 1930, 12 *L. Ed. 2d* 1050 (1964). In such cases, I believe the defendant is left impermissibly unprotected in the matter of punishment. Compare *United States ex rel Scoleri v. Banmiller*, 310 *F. 2d* 720 (*3d Cir.* 1962), *certiorari* denied, 374 *U. S.* 828, 83 *S. Ct.* 1866, 10 *L. Ed. 2d* 1051 (1963); *United States ex rel. Thompson v. Price*, 258 *F. 2d* 918 (*3d Cir.*), *certiorari* denied, 358 *U. S.* 922, 77 *S. Ct.* 295, 3 *L. Ed. 2d* 241 (1958). See also *Spencer v. State of Texas*, 385 *U. S.* 554, 87 *S. Ct.* 648, 17 *L. Ed. 2d* 606 (1967), particularly 385 *U. S.*, at *pp.* 567–568, 87 *S. Ct.*, at *pp.* 655-656, Mr. Justice Stewart concurring at 569, 87 *S. Ct.*, at 656, Mr. Chief Justice Warren and Mr. Justice Fortas dissenting at 570, 575, 580–581, 87 *S. Ct.*, at 657, 659, 662; *United States v. Curry*, 358 *F. 2d* 904, 914, 921 (*2d Cir.* 1965), *certiorari* denied, 385 *U. S.* 873, 87 *S. Ct.* 147, 17 *L. Ed. 2d* 100 (1966). If no convicted defendant, regardless of his crime, except murder, can be sentenced under the mandate of our practice rule until after a presentence investigation and report to the sentencing judge, due process and equal protection problems of constitutional dimension may be implicated.

There is a remedy for the deficiency of *Mount*. As Tentative Draft No. 9. of the A. L. I. Penal Code (1959) says:

"There is no reason to insist upon a choice between a method which threatens the fairness of the trial of guilt or innocence and one which detracts from the rationality of the determination of the sentence. The obvious solution, proposed by the Royal Commission on Capital Punishment, is to bifurcate the proceeding, abiding strictly by the rules of evidence until and unless there is a conviction, but once guilt has been determined opening the record to the further information that is relevant to sentence." Comment to §201.6, p. 74–75.

In our State, bifurcation would simply mean a two-stage trial in first degree murder cases. The first stage would settle the issue of guilt or innocence. If a guilty verdict resulted, the second stage would proceed before the same jury and the matter of punishment would be decided. In this phase, evidence deemed relevant to sentence by the trial court may be introduced. This would include defendant's background, family, educational and employment history, mental and physical condition, as well as mitigating or aggravating circumstances, within reasonable limits.

Four states have adopted the practice, California, *Cal. Penal Code* §§ 190, 190.1 (1957); Connecticut, *Gen. Stat. Conn.*, 1963 Supp. § 50–10 (1963); New York, *N. Y. Penal Law*, §§ 125.30, 125.35 (1963); and Pennsylvania, *Purdon's Pa. Stat. Ann.*, 1963, Tit. 18, § 4701 (1959). The Proposed Official Draft of the A. L. I. Model Penal Code includes it in §210.6 (May 4, 1962). The proposal follows the highly favorable comments on the two-stage trial appearing in Tentative Draft No. 9 of that Code, *supra,* at *pp.* 74–78 (1959). Among other things, that draft notes a report to the Institute that the results of the California procedure "are eminently satisfactory." *p.* 75. See 1 *Wigmore, Evidence,* § 194b (*3d ed.* 1940), at *pp.* 660–661; see also *Knowlton, Problems of Jury Discretion in Capital Cases,* 101 *U. Pa. L. Rev.* 1099, 1135–1136 (1953); *The California Penalty Trial,* 52 *Calif. L. Rev.* 386, 406–407 (1964); Note, 52 *Va. L. Rev.* 359, 366 (1966); *Handler, Background Evidence in Murder Cases,* 51 *J. Crim. L. C. & P. S.* 317, 323–327 (1960); *Report of Royal Commission on Capital Punishment,* 1949–1953 (*H. M. S. O.* 1953) (*Cmd. No.* 8932), 194–208, 214. A note, *The Two Trial System in Capital Cases,* 39 *N. Y. U. L. Rev.* 50, 77 (1964) points out some shortcomings in the system adopted in New York, but concludes that "the overall scheme of these amendments to the capital punishment laws is a significant step in the di-

rection of a worthy goal. * * * *"[2] I have found no criticisms of the bifurcated trial procedure which outweigh its decided advantages. Problems have arisen respecting the nature of the evidence admissible at the penalty trial. Although such trial should not be a one-way street, with the defendant alone permitted to offer evidence of mitigating circumstances, some reasonable measure of control over the nature and competency of the State's counterproof of aggravating circumstances should be imposed. This could be accomplished empirically by a court sensitive to the problems involved. There will always be problems, because no mode of procedure will make the administration of the death penalty run easy. But this is all the more reason to strive for the best that can be had in fair and efficient procedure. And, to repeat the Model Penal Code comment, "There is no reason to insist upon a choice between a method which threatens the fairness of the trial of guilt or innocence and one which detracts from the rationality of the determination of the sentence." Tentative Draft No. 9, *p. 74.*

In *Frady v. United States, supra,* as earlier indicated, three members of the court approved the bifurcated trial procedure in capital cases, and believed the court had authority to institute it. Some felt Congress had not conferred the power, and still others reserved opinion on the question. One judge, as noted in the majority opinion of our Court, referred to some of the problems involved in such a system and said they made "clear the utter folly of institution of such a system except after careful study of all of its ramifications."

---

2. As the statutes of California, Connecticut, New York and Pennsylvania and the Model Penal Code proposal reveal, there are variations in the procedural aspects of the penalty stage of the trial. For example, one significant factor is that if the jury cannot reach unanimous agreement as to punishment, the trial judge need not order a retrial of that issue. In his discretion he may impose a life imprisonment sentence. *Cal. Pen. Code* § 190.1. The variations need not be considered here. There is ample material available to enable this Court, with its rule making expertise, to adopt the most equitable procedure.

In my view there has been ample experience with the system in the four jurisdictions employing it, and ample study by students of its operation and effect to require rejection of the notion that its adoption by our Court would be "utter folly." Moreover, contrary to the suggestion of my colleagues, the Court of Appeals of the Second Circuit in *United States v. Curry, supra,* left the grant of such a trial to the discretion of the trial court, and said that in the future whenever demanded by a defendant, "it would be preferable to grant" the request. 358 *F. 2d,* at *p.* 916. The lone dissenter made plain his view that the two-stage procedure should be adopted, and that in failing to do so the majority disregarded "the great weight of case and commentary authority, which calls for the establishment of a mandatory two-stage trial rule." 358 *F. 2d,* at *p.* 920.

In our State no doubt can exist as to this Court's authority to adopt the bifurcated trial. Under the Constitution we have exclusive authority over matters of procedure. 1947 *Constitution, Art.* VI, § II, ¶ 3. Although establishment of the sentence in a capital case is a matter of substantive law, and therefore a legislative function, the manner in which such a case is tried obviously is in the control of this Court.

In my judgment the reasons for adoption of the split verdict procedure in capital cases are compelling. This is especially true when one considers the unsuitability of the alternatives presently in vogue in our State. It remains only to reiterate what has already been noted above, namely, that as an instrument of justice, the procedure finds little dissent among authoritative investigators of the subject, students of the criminal law, and states which have adopted it. In this connection I find particularly appropriate the language employed by my colleagues in arguing for their power to change a death sentence to one of life imprisonment. "There is little basis for perpetuation of * * * reluctance [to embrace the bifurcated trial], particularly in a State such as ours which has purposefully modernized and greatly strengthened its judicial system. In this process, this Court

has been constitutionally vested with wide judicial power, perhaps more sweeping than that granted to any other state court of last resort, and all to the end that it would be in a fair position to insure that justice is truly done. Surely its power may not rationally be found wanting in the particular circumstances presented here." (Bracketed insertion mine.)

## IV

The majority opinion does not discuss specifically the question whether the Supreme Court has constitutional authority to establish the split trial procedure. It does make a page reference to *State v. Mount* where some surprising *dictum* suggested that "further legislation would seemingly be required to enable its adoption in New Jersey." 30 *N. J.*, at *p.* 218. The main thrust of the majority's opinion in this case, however, is that a new trial on the issue of punishment would not be appropriate. The reason advanced is that the original jury could not be reconstituted, nor could a new jury pass on the matter of punishment without being familiar with "all the evidence," *N. J. S.* 2A:113–4, and production of all the evidence bearing on commission of the crime is no longer feasible because of the missing witness.

The missing witness presents no problem. His testimony can be read to a new jury. I agree with the language of the statute, that for guilt of first degree murder the accused shall suffer death unless the jury "shall by its verdict and as part thereof" recommend life imprisonment, should be interpreted to mean that the jury which returns the verdict of first degree murder should continue in the next and separate phase of the proceeding to decide punishment. That method is consistent with the statute and is extremely practical because the jury which is familiar with all the evidence as to the commission of the crime may turn its attention to all the additional factors which bear on punishment. If that method of bifurcation were followed and on appeal prejudicial error appeared only as to the issue of punish-

ment, can there be any doubt that this Court could order a new trial limited to punishment alone? On such a retrial, because of the language of *N. J. S.* 2A:113–4, the prosecution would have to reprove the crime and the circumstances attending it to enable the new jury to decide upon punishment, but the issue of guilt would not be open to reappraisal.

Assuming that this Court can establish the two-stage trial in capital cases, and that if established, retrial on punishment alone would be had for trial error occurring in and relating to the punishment stage, all of which I firmly believe this Court has the power to do by rule, a new trial on the issue of punishment alone may be ordered in this case in the existing state of our procedure. Before the advent of the bifurcated trial, unitary trials in capital cases in all jurisdictions which have jury trials resulted in one verdict—guilty of first degree murder with or without a recommendation of life imprisonment. Yet in California, for example, where the judicial branch of the government does not have the extensive authority over procedure possessed by this Court, long before adoption of the statute authorizing the bifurcated trial the Supreme Court in capital cases ordered a new trial on punishment. The court held that when the prejudicial error did not affect the issue of guilt or innocence, but only the choice of penalty as between death and life imprisonment, a remand could be ordered on the issue of punishment alone. *People v. Green, supra,* 302 *P.* 2d, at *pp.* 322–324. It said that although the fixing of the penalty is normally one of the "two necessary constituent elements" of the verdict, the penalty involves a determination which is clearly separate and distinct from the determination of guilt. 302 *P.* 2d, at *p.* 323. It is particularly noteworthy in the context of our case that the limited new trial was ordered under the provision of the penal code which authorized the court to "reverse, affirm or modify the judgment or order appealed from." But the Court said that provision conferred no power on it to reduce the death sentence to life imprisonment because the jury

"is vested with exclusive discretion to determine punishment." 302 *P. 2d,* at *p.* 325.

### V

Summarizing the reasons expressed above for this dissent, they are:

1. This Court is without authority to reduce a death sentence to life imprisonment. The will of the people, as expressed by the legislative branch of the Government, is being overruled by the order of the majority of my colleagues.

2. A prosecutor cannot waive the death penalty in a first degree murder case and make the waiver binding on the jury.

3. The bifurcated trial practice in capital cases should be adopted beginning with this case, and a remand ordered for trial of the issue of punishment alone.

4. If the Court is not inclined to adopt that general practice now, then under its plenary authority in *procedural* matters as exemplified in *R. R.* 1:9–1, to modify a judgment, its action here should be limited to an order for retrial as to punishment alone.

5. In the event the majority hold the opinion that a new trial as to punishment alone is not within the ambit of the Court's power, then the only recourse is to order a new trial on all issues in the case.

PROCTOR and HANEMAN, JJ., concur in result.

*For modification*—Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—Justice FRANCIS—1.